MADISON GAS & ELECTRIC COMPANY, Petitioner-Respondent,

v.

PUBLIC SERVICE COMMISSION OF WISCONSIN, Appellant.†

Court of Appeals

*No. 80-2098. Submitted on briefs August 31, 1981.—*
*Decided November 3, 1981.*
(Also reported in 313 N.W.2d 847.)

For the appellant the cause was submitted on the briefs of *Steven M. Schur,* chief counsel, and *Barry M. Levenson,* assistant chief counsel.

For the respondent the cause was submitted by *John A. Hansen, Richard K. Nordeng* and *Stafford, Rosenbaum, Rieser & Hansen* of Madison.

Before Foley, P.J., Dean and Cane, JJ.

FOLEY, P.J.   The Public Service Commission appeals from a judgment setting aside its order establishing electric service rates for Madison Gas and Electric Com-

† Petition to review granted. DAY, J., took no part.

pany. The circuit court concluded that the PSC's order was not supported by substantial evidence, and it remanded the matter to the PSC. The effect of the judgment is to require the PSC to allow an additional increase in MG&E's rates. We concur in the conclusion reached by the circuit court and affirm its judgment.

MG&E is entitled to earn a fair and reasonable rate of return on the fair value of its investment. *See Wisconsin Telephone Co. v. PSC,* 232 Wis. 274, 330, 287 N.W. 122, 130 (1939). Whether MG&E can earn a fair rate of return depends on the rates the PSC allows it to charge for electric service.[1] In determining rates that will allow MG&E to earn a reasonable rate of return, the PSC must first determine MG&E's investment "rate base," which consists of the property MG&E devotes to providing utility service. *Id.* The PSC then determines the electric service rates necessary to generate income sufficient to allow MG&E to earn what the PSC has determined to be a reasonable rate of return on the rate base.[2]

Like other regulatory commissions, the PSC has historically used a test period or test year to determine a utility's income. The historic test year concept assumes that a utility's past experience will be representative of what will occur in the future when new rates will be in effect. *See* Downs, *The Use of The Future Test Year in Utility Rate-Making,* 52 B.U.L. Rev. 791, 792 (1972).

[1] MG&E sells electricity to retail customers, or "ratepayers" and to other electric utilities, or wholesale customers. The PSC must consider the total amount of revenue MG&E receives from both retail and wholesale customers in order to determine the rates MG&E may charge retail customers.

[2] The PSC found MG&E's investment rate base to be $185,916,000, and the fair and reasonable rate of return on that investment to be 11.42%. The PSC determined that in 1980, MG&E would require total revenue of $91,170,000 in order to earn an 11.42% return on investment.

The use of historic test years has, however, been criticized, mainly because they do not take into account future economic trends, such as inflation. To better account for future economic trends, regulatory commissions, including the PSC, have turned to future or forward-looking test years.

A future test year was used by the PSC in this case. MG&E applied for a rate increase in mid-1979. MG&E's rate increase application relied on data projections for a 1979 test year. It projected that in 1979, its revenues from wholesale customers would total $8,337,000. The PSC utilized a 1980 test year and projected that in 1980, MG&E's wholesale revenues would total $16,341,000. MG&E does not challenge this projection.

The dispute in this case arises because the PSC increased its $16,341,000 wholesale revenue projection by $1,274,000. The increased sum was then used to determine the total amount of additional revenue the PSC determined MG&E would require from retail customers in order to earn its authorized rate of return. The PSC characterizes its $1,274,000 addition to wholesale revenues as a *"pro forma"* adjustment and contends that this adjustment of revenues was made in a manner consistent with the procedures it follows in making test year projections in general.

Although we agree with the PSC that in setting new utility rates it is reasonable and often necessary to make adjustments based on projected data, we disagree with the PSC's contention that its $1,274,000 adjustment is consistent with the procedures it followed in making other test year projections. The PSC's original wholesale revenue projection of $16,341,000 was derived from projections prepared by the PSC's Accounts and Finance Division. A PSC staff accountant testified that the wholesale revenue projection was based on MG&E's levels of sales to other utilities in 1978 and 1979, ad-

justed to reflect changes in MG&E's generating capacity and to normalize such sales for abnormal weather conditions. The most recent data regarding sales to wholesale customers was used and although other methods of projecting wholesale revenue projections were considered, the method actually employed was the one the witness viewed as being the most reliable. This testimony provides substantial evidence to support the projection.[3]

Conversely, the PSC's $1,274,000 adjustment was not derived from data bearing on the volume of MG&E's past or future sales to other utilities. It was instead based solely on the costs associated with the maintenance of MG&E's excess generating facilities.[4] It was based solely on the desire of the two-member majority of the commission to shift the burden of excess capacity costs from ratepayers to MG&E and its stockholders.[5] The shift was made even though MG&E's excess capacity was not found to be the result of bad management.[6] There

---

[3] As Downs notes, "the validity of projected test year data may be readily established by an examination of the methodology employed in arriving at projections." 52 B.U.L. Rev. at 802.

[4] Evidence presented by both MG&E and the PSC indicates that MG&E's power plants are capable of generating a significantly greater amount of electricity than has been historically demanded by MG&E's retail customers. This excess capacity exists even when a 15% reserve margin, or the amount of extra generating capacity generally recognized as necessary for an electric utility to maintain adequate electric service in the event of unexpected demand surges or the temporary loss of a portion of generating capacity, is added to the maximum amount of electricity MG&E's ratepayers have demanded. The PSC found that at the time of the rate hearing, MG&E's total generating capacity ranged from 597 to 602 megawatts (MW) and that the "native demand" in MG&E's service area, that is, the amount demanded by ratepayers, including a 15% reserve margin, totaled 403 MW.

[5] This result is admitted in the concurring opinion of commissioner Charles J. Cicchetti.

[6] Had the PSC found that MG&E's excess capacity was the result of poor planning on the part of MG&E's management, it

is no evidence that MG&E can earn the additional $1,274,000.[7]

We conclude that the $1,274,000 addition to wholesale revenues, and consequently the rate order, must therefore be set aside. The purpose of the revenue estimate was to predict future revenues. If adjustments are to be made to the prediction, the adjustments must be supported by substantial evidence. *See In re Permian Basin Area Rate Cases,* 390 U.S. 747, 791–92 (1968) ; *In re Roanoke Gas Co.,* 20 P.U.R.4th, 117, 118 (Va. St. Corp. Comm'n 1978) ; *In re Public Service Co. of Colorado,* 34 P.U.R.3d 207, 208 (Colo. Pub. Util. Comm'n 1960). If the adjustments are not supported by substantial evidence, they may, as has occurred in this case, deprive the utility of its opportunity to earn what the PSC has determined to be a fair and reasonable rate of return. Ratepayer relief, the stated goal of the PSC majority, is a commendable goal. The goal cannot be realized, however, if it deprives the utility of the opportunity to earn a fair and reasonable rate of return.

*By the Court.*—Judgment affirmed.

---

could have removed from MG&E's rate base the amount of generating plant found to be "not used and useful" in serving customers. *See Wisconsin Telephone Co.,* 232 Wis. at 341–48, 287 N.W. at 153–58 (1939). By removing property from MG&E's rate base, the total amount of revenue required by MG&E to earn a reasonable rate of return on investment would have been reduced. Alternatively, the PSC may have been able to reduce MG&E's authorized rate of return to reflect MG&E's reduced need to attract capital.

[7] This fact is noted in the dissent of commission chairman Stanley York.