Madison Gas & Electric Company,
Petitioner-Respondent,

v.

Public Service Commission of Wisconsin,
Appellant-Petitioner.

Supreme Court

*No. 80–2098. Argued October 4, 1982.—Decided November 2, 1982.*

(Also reported in 325 N.W.2d 339.)

For the appellant-petitioner the cause was argued by *Barry M. Levenson,* assistant chief counsel, with whom on the briefs was *Steven M. Schur,* chief counsel.

For the respondent there was a brief by *John A. Hansen, Richard K. Nordeng, Kristine A. Euclide* and *Stafford, Rosenbaum, Rieser & Hansen,* Madison, and oral argument by *John A. Hansen.*

DAY, J. This is a review of a decision of the court of appeals published at 105 Wis. 2d 385, 313 N.W.2d 847 (Ct. App. 1981) affirming a judgment of the Circuit Court for Dane County, the Honorable Howard W. Latton, Circuit Judge of Columbia County presiding, in a Chapter 227 judicial review proceeding, which set aside a portion of a Public Service Commission (hereinafter PSC) order setting electric service rates for Madison Gas and Electric Company (hereinafter MG&E).[1]

There are two issues raised on review. The first is whether the PSC rate order which made a $1,274,000 "adjustment" in the amount it estimated MG&E could realize from the sale of the utility's "excess" capacity to other utilities was supported by substantial evidence

---

[1] PSC Docket No. 3270–UR–9.

in the record. The second issue is whether the PSC can, absent a determination that a utility's excess generating capacity was imprudently acquired or not used or useful to ratepayers, shift all or part of the cost of maintaining the excess from ratepayers to utility shareholders.

We conclude the PSC action was not supported by substantial evidence in the record. We also conclude that for the PSC to shift all or part of the cost of excess capacity to shareholders, the PSC must determine that the excess was improvidently acquired or not used or useful to ratepayers. Accordingly, we affirm the decision of the court of appeals.

On May 31, 1979, MG&E filed an application with the PSC for authority to increase its rates for electricity and natural gas. The PSC made a determination that MG&E's existing rates for electric utility service were too low because the revenue produced by them was "inadequate." Based upon that determination, the PSC proceeded to first determine the rate base[2] on which MG&E was entitled to earn a reasonable return. MG&E's rate base was calculated at $185,916,000. This amount included all of MG&E electric generating capacity.

The PSC then determined that 11.42 percent would constitute a reasonable and just return on MG&E's rate base. Multiplying the return times the rate base, plus operating expenses and taxes, equals the revenue requirement.

MG&E obtains its revenue from two sources: sales of electricity to retail customers and sales of either electricity or electric generating capacity to other utilities (wholesale sales). It is the PSC's estimate of the amount of revenue realizeable from the latter source that is at

[2] The rate base is the investment on which MG&E is entitled to earn a reasonable rate of return. Although the term rate base is used throughout this opinion, we are specifically referring to the 1980 test year net investment rate base.

issue in this case. The PSC's staff witness projected that MG&E would receive wholesale revenue of $16,341,-000. This projection differed from MG&E's own predictions which had been made prior to the application for a rate increase.[3] At the hearing, however, no one contested the staff projection nor offered any evidence to support a different projection. Thus, the only evidence in front of the PSC concerning MG&E's likely revenue from wholesale sales projected such revenues at $16,341,000.

Although unchallenged PSC staff estimates placed MG&E wholesale sales revenue at $16,341,000, the PSC in its rate order determined that an additional $1,274,000 should be added to this estimate. The effect of this addition was to reduce by that amount the revenue MG&E would need to collect from its retail customers. The PSC's express purpose in making this addition was "to adjust for [MG&E's] cost of excess generating capacity . . . ."[4]

MG&E operates a physical plant which is capable of generating a maximum of 602 megawatts (MW).[5] The

---

[3] MG&E projected revenues from wholesale sales to be $8,-337,000 for all of 1979. By March, 1979, these revenues had exceeded the amount projected for the entire year. The difference between the PSC and MG&E projections arises because of the method each used in making the projection. MG&E projected its future wholesale revenue based upon its past experience. The PSC staff used a future test year (1980), in making its projections. The latter method has become increasingly favored because it takes into account future economic trends. *See*, Downs, *The Use Of The Future Test Year In Utility Rate-Making*, 52 B.U.L. Rev. 791, 797–801 (1972).

[4] PSC Order Docket No. 3270–UR–9, *Findings Of Ultimate Facts No. 7.*

[5] The total capacity of the MG&E system is 602 MW or 597 MW depending on whose estimate is used. We will use 602 MW for the purposes of this opinion which is the estimate provided by the PSC staff.

highest peak demand[6] ever experienced by MG&E was 370 MW in the summer of 1978. The peak demand for 1979 was 349. MG&E projected its peak demand for 1979 at 403 MW. Using the 370 MW figure for peak demand, it is apparent that MG&E had 233 MW of capacity over that which would be demanded by its retail customers. From this amount, a reserve margin[7] of fifteen percent (.15 x 370) or 55.5 MW must be subtracted leaving an excess of 177.5 MW. This represents 29.5 percent of MG&E's total generating capacity. Of this amount, MG&E sells part to other utilities.

MG&E participates in the Wisconsin Power Pool.[8] "Pool" members agree to buy and sell capacity from each other depending on their needs. MG&E was a seller of capacity to the other "pool" members. The "pool" agreement does not prohibit members from selling capacity or energy to non-pool members. However, MG&E has relied exclusively upon the "pool" to sell its capacity or energy to wholesale customers. MG&E claimed that these sales were profitable or at least compensatory. A PSC staff expert disagreed claiming that capacity sales were made for less than cost.[9] The PSC made no express finding on this question.

---

[6] "Peak demand" refers to the highest demand for power ever experienced by a utility as a result of retail customer power requirements.

[7] Utilities must have capacity over their expected peak in order to provide for unexpected demand or a temporary loss of generating plant. This excess capacity is known as a "reserve margin." Fifteen percent of peak demand is generally considered to be the minimum reasonable reserve margin. *See, Re. Iowa Public Service Co.*, 46 PUR. 4th, 339, 366, 368 (Iowa, 1982).

[8] Other Pool members are Wisconsin Power and Light Company and Wisconsin Public Service Corporation.

[9] The difference results from the manner in which the cost of the capacity is calculated. MG&E claimed that a specific plant produced most of the energy sold to other utilities and thus the cost of that plant's capacity should be used in deter-

MG&E did not sell all of this "excess" capacity to "pool" members. Some went unused except to the extent it provided MG&E with additional reserve capacity. Concerning the possibility of selling more capacity, a PSC staff engineer testified that even though a "buyers' market" for capacity existed, it would not be "impossible" to sell the capacity.

The PSC offers two bases for upholding the challenged portion of its rate order. The first argument advanced is that the $1,274,000 "adjustment" is supported by substantial evidence in the record and thus the court is required to refrain from substituting its judgment for that of the agency.[10]

When the PSC engages in rate making, it is governed by the rules applicable to "Class 1 proceeding" contested cases.[11] Judicial review of PSC rate orders is authorized by sec. 196.41, Stats. 1979–80.[12] The scope of the court's

mining whether the sale of capacity to the "Pool" members was profitable. The PSC staff expert argued that the average cost of the entire MG&E system capacity should be used.

[10] The PSC argues that, given the fact that MG&E's excess capacity did not benefit ratepayers, there is no need for any evidence that MG&E can earn the $1,274,000. It then, however, goes on to claim that there is sufficient evidence to meet the substantial evidence test.

[11] Section 227.01(2), Stats. 1980, in relevant part reads:

"227.01. **Definitions.** In this chapter: . . . (2) 'Contested case' means a proceeding before an agency in which, after hearing required by law, substantial interests of any party to such proceeding are determined or adversely affected by a decision or order in such proceeding and in which the assertion by one party of any such substantial interest is denied or controverted by another party to such proceeding. There are 3 classes of contested cases as follows:

"(a) A 'class 1 proceeding' is a proceeding in which an agency acts under standards conferring substantial discretionary authority upon the agency. Class 1 proceedings include, but are not restricted to rate making, . . ."

[12] "196.41. **Court review.** Any order or determination of the commission may be reviewed in the manner provided in ch. 227."

review of an agency's action in a contested case is set out in sec. 227.20(6), Stats. 1979–80, which provides:

"227.20. **Scope of review. . . .** (6) If the agency's action depends on any fact found by the agency in a contested case proceeding, the court shall not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding fact. The court shall, however, set aside agency action or remand the case to the agency if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence in the record."

Thus, unless the agency's action is not supported by "substantial evidence in the record," it is this court's responsibility to uphold the PSC's order. In applying the substantial evidence test to this case, this court is required by sec. 227.20(10), Stats. 1980, to accord due weight to the "experience, technical competence, and special knowledge of the agency involved, as well as the discretionary authority conferred upon it."

The substantial evidence test has been variously defined.[13] Substantial evidence does not mean a preponderance of the evidence. Rather, the test is whether, taking into account all the evidence in the record, "reasonable minds could arrive at the same conclusion as the agency." *Sanitary Transfer & Landfill, Inc. v. DNR*, 85 Wis. 2d 1, 15, 270 N.W.2d 144 (1978).

The PSC offers three items of evidence which it claims provide sufficient support for a finding that MG&E could earn the additional $1,274,000. First, the PSC notes that MG&E exceeded its own 1979 projection for revenue from wholesale sales. However, MG&E in ef-

---

[13] *Boynton Cab Co. v. ILHR Dept.*, 96 Wis. 2d 396, 405, 291 N.W.2d 850 (1980); *Daly v. Natural Resources Board*, 60 Wis. 2d 208, 219–220, 208 N.W.2d 839 (1973); *Gateway City Transfer Co. v. Public Service Comm.*, 253 Wis. 397, 405–406, 34 N.W.2d 238 (1948).

fect, conceded the inaccuracy of its own projection when it left unchallenged the PSC staff estimate of wholesale sales revenue. In addition, there is no indication whatsoever that actual revenues would exceed the PSC staff estimate.

Second, the PSC points to testimony by a PSC engineer that a market for MG&E capacity sales did exist. The record shows, however, that the engineer testified that while a "buyer's market" for capacity existed, it would not be *impossible* to sell the capacity. Even if we accept that the engineer's testimony indicated that some capacity could be sold, there's no testimony as to how much could be sold.

Finally, the PSC claims that the fact that MG&E never tested the market on its own to determine if it could sell any of its capacity supports making the $1,-274,000 "adjustment." The PSC reasons that because MG&E did not test the market on its own, this means that MG&E never made any effort to sell capacity and thus additional sales could likely be made. However, there is express testimony which showed that MG&E relied on the "pool" to make its sales of capacity to non-pool members. However, MG&E's failure to test the market says little about its ability to earn an additional $1,274,000 in revenue from capacity sales.

The items discussed above are the only ones the PSC relies on to support its conclusion that MG&E could earn an additional $1,274,000 in revenue from wholesale sales. It is questionable as to whether they provide sufficient support for making any revenue adjustment let alone one amounting to over $1.2 million. This is especially true when one considers the fact that the PSC had before it a detailed analysis which specified the amount MG&E could realistically be expected to earn from wholesale sales. Taking into account all of the items of evi-

dence which the PSC claims support its making the $1,274,000 "adjustment," we cannot say that a reasonable mind could reach the conclusion that MG&E was capable of earning this additional revenue.

The second issue on review is whether the PSC can, absent a determination that a utility's excess generating capacity was imprudently acquired or not used or useful to ratepayers, shift part of the cost of maintaining the excess from ratepayers to utility shareholders.

Section 196.02(1), Stats. 1980, provides that the PSC "is vested with power and jurisdiction to supervise and regulate every public utility in this state, and to do all things necessary and convenient in the exercise of such power and jurisdiction." This court has stated that, in determining rates, the PSC has ". . . wide discretion in determining the factors upon which it may base its precise rate schedule." *West Allis v. Public Service Comm.*, 42 Wis. 2d 569, 577, 167 N.W.2d 401 (1969). This discretion, while broad, is not unbounded.

This court has twice discussed the PSC's authority to deal with the problem of excess capacity.[14] In both *Wisconsin Telephone* and *Milwaukee S. & T. Corp.*, the court held that the PSC has the authority to shift some of the cost of excess generating capacity to utility shareholders where (1) the excess generating capacity was imprudently acquired, or (2) the excess capacity was not used or useful in serving the public.[15] 232 Wis. at 348;

[14] *Wisconsin Telephone v. Public Service Comm.*, 232 Wis. 274, 287 N.W. 122 (1939); *Milwaukee S. & T. Corp. v. Public Service Comm.*, 13 Wis. 2d 384, 108 N.W.2d 729 (1961).

[15] Footnote 6 in the court of appeal's opinion in this case (105 Wis. 2d 385, 388) suggests that imprudent acquisition of excess capacity is the sole rationale upon which the PSC could have found the excess not "used or useful." These tests are independent. A finding of imprudent acquisition or that the capacity is not used or useful may provide sufficient basis for the PSC to

13 Wis. 2d at 393. These tests have been adopted in other jurisdictions.[16]

The tests are not ones which can be mechanically applied to come up with a sure result. We agree with the Iowa State Commerce Commission which wrote: "we cannot simply apply either legal standard . . ., but must explore the purposes of each test and decide how best to achieve those purposes." *Re. Iowa Public Service Co.*, 46 PUR 4th 339, 367 (Iowa, 1982). In *Iowa Public Service Co.*, the Iowa Commission adopted a two step approach to assigning the part of the cost of excess capacity to utility shareholders. First, the commission determined that excess capacity existed. Second, the commission determined ". . . whether and to what extent investors should be compensated for their investment in excess capacity." 46 PUR 4th at 368. This latter decision required a ". . . balancing of investors' interest in receiving compensation for risks they have reasonably assumed, while protecting customers from management decisions that unjustifiably increase the prices they pay." 46 PUR 4th at 368.

The PSC could under the facts before it reasonably determine that MG&E had excess generating capacity. However, such a finding does not end the decision-making process. It sets the stage for a reasoned determination of who shall bear the burden of paying for all or part of the excess capacity. Such an examination is completely absent from the PSC's order.

The PSC has considerable discretion in determining the factors upon which it bases its rate orders. *West Allis*, 42 Wis. 2d at 577. However, as this court has stated, "[d]iscretion is more than a choice between al-

allocate all or part of the cost of the excess capacity to the utility shareholders.

[16] *See, Pennsylvania Public Utility Comm. v. Philadelphia Electric Co.*, 37 PUR 4th 381, 387 (Pa. P.U.C., 1980); *Re Mon-*

ternatives without giving the rationale or reason behind the choice." *Reidinger v. Optometry Examining Board,* 81 Wis. 2d 292, 297, 260 N.W.2d 270 (1977). Quoting from *McCleary v. State,* 49 Wis. 2d 263, 277, 182 N.W.2d 512 (1971), this court stressed that ". . . the term contemplates a process of reasoning . . . and a conclusion based on a logical rationale founded upon proper legal standards." 81 Wis. 2d at 297.

The PSC gave no rationale for its action beyond that it was "just and reasonable to adjust for [MG&E's] cost of excess generating capacity. . . ."[17] This is not sufficient to convince this court that the PSC made a reasoned determination that MG&E's ratepayers should not bear the cost of the utility's excess capacity. Neither the "imprudently acquired" nor the "used or useful" tests were applied. There was no discussion as to why the costs of excess capacity should be placed on both the shareholders and ratepayers. There is nothing in the PSC order which shows this court that the PSC gave any consideration whatsoever to the legal standards which should govern excess capacity problems. The arbitrary adjustment made by the PSC in order to shift part of the cost of MG&E's excess capacity to MG&E's shareholders is outside of the discretionary authority conferred upon the PSC.

*By the Court.*—The decision of the court of appeals is affirmed.

---

*tana-Dakota Utilities Co.,* 44 PUR 4th 249, 254 (N.D. P.S.C., 1981); *see generally,* 64 Am. Jur. 2d, Public Utilities, sec. 139 (1972).

[17] Findings of Ultimate Fact, No. 7.