CHILSTROM ERECTING CORP., Petitioner-Appellant,

v.

Wisconsin DEPARTMENT OF REVENUE, Respondent-Respondent.

Court of Appeals

*No. 91-2122. Submitted on briefs December 3, 1992.—Decided February 23, 1993.*

(Also reported in 497 N.W.2d 785.)

For the petitioner-appellant the cause was submitted on the briefs of *Donald H. West*, with *David M. Davis, Jr.*, of *Niemann, West & Darnieder*, of Milwaukee.

For the respondent-respondent the cause was submitted on the briefs of *James E. Doyle*, attorney general, with *Gerald S. Wilcox*, assistant attorney general, of Madison.

Before Wedemeyer, P.J., Sullivan and Fine, JJ.

SULLIVAN, J.   Chilstrom Erecting Corp. (Chilstrom) appeals from an order of the circuit court confirming a franchise tax assessment of the Wisconsin Tax Appeals Commission (WTAC) for the years 1981 through 1985.[1] The WTAC order denied Chilstrom's petition for review of an order of the Wisconsin Department of Revenue (DOR) that denied Chilstrom's objection to the assessment. Chilstrom argued that the DOR's adjustments to the franchise tax returns were improper because Chilstrom's in-state and out-of-state operations were not a unitary business entity and, therefore, Chil-

---

[1] The circuit court review of the WTAC determination was provided by sec. 73.015(2) and 227.53(1)(a)1., Stats. The appeal to this court is provided by sec. 227.58, Stats.

strom's out-of-state income is not subject to taxation by the State of Wisconsin. Rather, Chilstrom claimed, the income had been properly reported through a separate accounting, which attributed all of the out-of-state income to the state in which the individual joint ventures operated.

The issues presented on appeal are: (1) whether WTAC's factual findings regarding the relationship between Chilstrom's in-state and out-of-state operations are supported by the record; (2) whether Chilstrom's Wisconsin operations and eight out-of-state joint ventures comprised a unitary business that was subject to apportionment of taxable income under sec. 71.07(2), Stats.,[2] and in accordance with the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

---

[2] The relevant subsections of sec. 71.07(2), Stats. (1985-86) (since renumbered sec. 71.25(5) and (6)), provided:

**(1m) Corporations.**
**(b) Apportionable income.** Except as provided in sub. (2), corporations engaged in business both within and without this state are subject to apportionment. Apportionable income includes all income or loss of corporations, other than nonapportionable income as specified in par. (c) . . . .
. . . .
**(2)** Corporations, nonresident individuals and nonresident estates and trusts engaged in business within and without the state shall be taxed only on such income as is derived from business transacted and property located within the state. The amount of such income attributable to Wisconsin may be determined by an allocation and separate accounting thereof, when the business of such corporation, nonresident individual or nonresident estate or trust within the state is not an integral part of a unitary business, but the department of revenue may permit an allocation and separate accounting in any case in which it is satisfied that the use of such method will properly reflect the income taxable by this state . . . .

## BACKGROUND

WTAC found the following facts. From 1981-85, the tax assessment period, Chilstrom was a Wisconsin corporation with its principal place of business in Milwaukee, Wisconsin. Chilstrom was in the business of placing reinforced steel in concrete for the construction of roads, buildings and other structures. In its Wisconsin operations, Chilstrom performed the work as a subcontractor. For the out-of-state projects, Chilstrom formed joint ventures with other contractors. Nonetheless, the type of work done on the in-state projects and the out-of-state projects was essentially the same.

The operations did not require specialized equipment. In Wisconsin, Chilstrom owned several pickup trucks and several trailers in which the workers would change into and out of work clothes. For the out-of-state projects, the equipment was either purchased or leased by the joint venture and disposed of upon completion of the project. Chilstrom did not provide the steel for either the in-state or out-of-state projects.

In Wisconsin, Chilstrom operated through its three corporate officers, all of whom worked part-time in the business, and one full-time general manager. Chilstrom employed one part-time bid preparer and two full-time supervisors who, among other tasks, prepared bids for projects. Chilstrom also contracted with an accountant for services including preparation of tax returns and advising management of cost overruns for projects both in-state and out-of-state. In Wisconsin, Chilstrom hired foremen and iron workers, while the out-of-state joint ventures hired a project manager who in turn hired the foremen and iron workers.

Chilstrom became involved in the joint ventures by seeking out-of-state projects. Chilstrom obtained specifications and project plans and was in contact with other

521

contractors in search of potential joint venture partners. If bids were rejected, Chilstrom absorbed all the expenses it incurred.

Chilstrom's eight joint venture agreements all contained essentially the same provisions for equal sharing of profits, losses and initial capitalization costs, and provisions for the selection of representatives to handle all matters pertaining to the performance of the project. The agreements also contained a provision that the cost of added clerical or accounting personnel solely attributable to the joint venture would be charged to the joint venture. While travel, lodging and food expenses that Chilstrom officers incurred while in pursuit of the out-of-state contracts were chargeable to the joint venture, Chilstrom's overhead expenses and time expended by Chilstrom employees on any out-of-state projects were absorbed by Chilstrom itself, and were not chargeable to the joint venture.

The agreements provided that the hiring and firing of project managers and other management matters would be decided by consensus of the two joint venturers. WTAC found that Chilstrom actually controlled the performance of the projects by its control over the project managers. Project managers reported to the senior management of each joint venture partner, and both joint venture partners shared responsibility for the direction, supervision and evaluation of each project manager. Chilstrom's management visited all sites every six to eight weeks and visited particular sites when problems developed.

WTAC set forth in its findings the following net income and net loss which Chilstrom reported from Wisconsin and out-of-state operations:

| YEAR | WISCONSIN | OUTSIDE WISCONSIN |
|------|-----------|-------------------|
| 1976 | (82,027)  | 49,316    |
| 1977 | (225,456) | 697,666   |
| 1978 | (225,068) | 175,028   |
| 1979 | (365,284) | 491,316   |
| 1980 | (390,170) | 36,102    |
| 1981 | (266,617) | 484,115   |
| 1982 | (346,572) | 1,328,046 |
| 1983 | (323,016) | 1,338,323 |
| 1984 | (514,471) | 645,948   |
| 1985 | (568,261) | 9,684     |

WTAC determined that, because Chilstrom's Wisconsin operation assumed out-of-state operating expenses, Chilstrom had underreported its Wisconsin income for tax purposes.[3]

---

[3] Chilstrom argues that its actual performance reflects an income of $58,314 for this period. Chilstrom argues that its "[r]eal economic performance" in Wisconsin is reflected by the following table:

| 1976 | ($10,785)  |
|------|------------|
| 1977 | (110,491)  |
| 1978 | 3,786      |
| 1979 | (71,066)   |
| 1980 | 375,965    |
| 1981 | 64,312     |
| 1982 | (38,589)   |
| 1983 | (29,666)   |
| 1984 | (102,117)  |
| 1985 | (23,035)   |

Accepting at face value Chilstrom's figures, we nevertheless conclude that WTAC's finding that its Wisconsin operation included costs allocable to the projects is supported by substantial evidence.

## WTAC FINDINGS

■

Chilstrom disputes various factual findings that are before this court. Our review lies to the agency's findings, not the findings and conclusions of the trial court. *Keeler v. LIRC*, 154 Wis. 2d 626, 632, 453 N.W.2d 902, 904 (Ct. App. 1990). We may not overturn the agency's findings of fact if they are supported by substantial evidence. Section 227.57(6), Stats. On questions of witness credibility and weight to be accorded to the evidence, we defer to the agency. *Nelson Bros. Furniture v. DOR*, 152 Wis. 2d 746, 760, 449 N.W.2d 328, 333-34 (Ct. App. 1989). Our only inquiry is "whether, taking into account all the evidence in the record, 'reasonable minds could arrive at the same conclusion as the agency.' " *Madison Gas & Elec. v. Public Serv. Comm'n*, 109 Wis. 2d 127, 138, 325 N.W.2d 339, 342-43 (1982) (quoting *Sanitary Transfer & Landfill Inc. v. DNR*, 85 Wis. 2d 1, 14, 270 N.W.2d 144, 150 (1978)).

Chilstrom argues that WTAC's factual findings are erroneous, citing the following support: (1) that there were certain projects where the joint venture purchased and fabricated its own materials; (2) that there were differences in the projects, citing sophisticated techniques such as multi-strand post-tensioning and use of other post-tensioning work requiring specialized equipment unique to the job; (3) that Chilstrom did not provide labor for the projects but instead the joint venture hired workers from union halls; and (4) that Chilstrom did not control management of the projects, but rather, such control was vested in a project manager who was autonomous.

Chilstrom argues that these "facts," to the extent that they are supported by the record, could have supported a different WTAC conclusion. However, our job is not to find support for findings that WTAC did not make, but rather, to probe the record for evidence supportive of the WTAC findings. Our review of the evidence and the inferences that could be reasonably derived from the record leads us to conclude that WTAC's findings are based on substantial evidence.

## UNITARY BUSINESS

Chilstrom also challenges WTAC's finding that Chilstrom's in-state and out-of-state businesses were unitary. Chilstrom argues that because the businesses were not unitary, that taxation of the out-of-state income violates the Fourteenth Amendment Due Process Clause.[4] We disagree.[5]

---

[4] U.S. Const. amend. XIV, sec. 1, provides in part: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."

[5] Chilstrom also argues that because its operations were not unitary, the tax violated the Commerce Clause of the United States Constitution. Chilstrom makes its Commerce Clause argument by merely quoting language from *Trinova Corp. v. Michigan Treasury Dept.*, 111 S. Ct. 818, 828 (1991), in which the Court said: "[W]e will sustain a tax against Commerce Clause challenge so long as 'the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State.' " Chilstrom, however, fails to argue how its claim of non-unitariness relates to the language quoted from *Trinova*, or violates the Commerce Clause. We decline to make such an argument on behalf of the appellant. Instead, we decline to review this issue as it was not

The question of whether Chilstrom's operations constitute a unitary business is a question of law. *DOR v. Exxon Corp.*, 90 Wis. 2d 700, 714, 281 N.W.2d 94, 102 (1979), *aff'd, Exxon Corp. v. Wisconsin Dept. of Revenue*, 447 U.S. 207 (1980). This court usually decides questions of law *de novo. Nelson Bros. Furniture v. DOR*, 152 Wis. 2d 746, 753, 449 N.W.2d 328, 330 (Ct. App. 1989). However, when the agency has particular competence or expertise on an issue, we will sustain its legal conclusions if they are reasonable. *Id.* at 753, 449 N.W.2d at 330-31. We also accord special deference to the agency's decision if it is intertwined with value and policy determinations. *Id.* at 753, 449 N.W.2d at 331. The supreme court, in *Exxon*, while holding that the unitariness issue is a question of law, did not express an opinion as to whether the commission's finding of unitariness was to be reviewed *de novo*, or was to be accorded special deference. *Exxon*, 90 Wis. 2d at 714, 281 N.W.2d at 100. Regardless of which standard of review we employ in this case, the outcome remains the same.

The Wisconsin Supreme Court applied the following definition of the unitary business entity in *Exxon*: "[T]he essential test is whether or not the operation of the portion of the business within the state is dependent upon or contributory to the operation of the business outside the state. If there is such a relationship the business is unitary." *Id.* at 711, 281 N.W.2d at 100 (citation omitted).

Chilstrom bases its due process challenge upon *Mobil Oil Corp. v. Commissioner of Taxes*, 445 U.S. 425, 439 (1980), in which the Supreme Court stated that "the

---

adequately argued in the brief. *See In re Balkus*, 128 Wis. 2d 246, 255, n.5, 381 N.W.2d 593, 598 n.5 (Ct. App. 1985).

linchpin of apportionability in the field of state income taxation is the unitary-business principle." Out-of-state income is not subject to apportionment if its source is a "discrete business enterprise." *Id.* at 439-40. Rather, the contributions of income must result from " 'functional integration, centralization of management, and economies of scale.' " *F.W. Woolworth v. Taxation and Revenue Dept.*, 458 U.S. 354, 364 (1982) (quoting *Mobil*, 445 U.S. at 438).

Chilstrom contends that its operations cannot be considered unitary under the tests set forth in *Exxon*, *Mobil* and *Woolworth*. We disagree.

In *Container Corp. of America v. Franchise Tax Board*, 463 U.S. 159, 162-63 (1983), a case not cited in the appellant's brief, the Supreme Court reviewed the California Franchise Tax Board's finding that a corporation and its foreign subsidiaries were a unitary business. The interplay between the various operations in *Container Corp.* were similar to that of Chilstrom and its joint ventures. The Court noted, with approval, the following indicators of the relationship between the operations, as relied upon by the state court:

> These included appellant's assistance to its subsidiaries in obtaining used and new equipment and in filling personnel needs that could not be met locally, the substantial role played by appellant in loaning funds to the subsidiaries and guaranteeing loans provided by others, the "considerable interplay between appellant and its foreign subsidiaries in the area of corporate expansion," the "substantial" technical assistance provided by appellant to the subsidiaries, and the supervisory role played by appellant's officers in providing general guidance to the subsidiaries.

*Id.* at 179 (citations omitted). The Court went on to elaborate on two factors which are particularly relevant to the present case:

> The first of these is the flow of capital resources from appellant to its subsidiaries through loans and loan guarantees. There is no indication that any of these capital transactions were conducted at arm's length, and the resulting flow of value is obvious. . . . [C]apital transactions can serve either an investment function or an operational function. In this case, appellant's loans and loan guarantees were clearly part of an effort to ensure that "[t]he overseas operations of [appellant] continue to grow and to become a more substantial part of the company's strength and profitability."
>
> The second noteworthy factor is the managerial role played by appellant in its subsidiaries' affairs. We made clear in F. W. Woolworth Co. that a unitary business finding could not be based merely on "the type of occasional oversight—with respect to capital structure, major debt, and dividends—that any parent gives to an investment in a subsidiary. . . ." As Exxon illustrates, however, mere decentralization of day-to-day management responsibility and accountability cannot defeat a unitary business finding. The difference lies in whether the management role that the parent does play is grounded in its own operational expertise and its overall operational strategy. In this case, the business "guidelines" established by appellant for its subsidiaries, the "consensus" process by which appellant's management was involved in the subsidiaries' business decision, and the sometimes uncompensated technical assistance provided by appellant, all point to precisely the sort of operational role we found lacking in F. W. Woolworth.

*Id.* at 180 n.19.

Chilstrom's situation provides an even stronger basis for a finding of a unitary business enterprise than was present in *Container Corp.* Thus, we reject Chilstrom's arguments that the mere contribution of formation capital did not result in a unitary business, that economies of scale were not realized,[6] and that Chilstrom's Wisconsin operations were not financially interdependent with the projects.

As was the case in *Container Corp.*, Chilstrom supplied money not for the mere purpose of investment, but rather to serve an operational function. Chilstrom and its partner provided all start-up capitalization and the only source of operating capital. As in *Container Corp.*, there is no evidence that this transfer of money was accomplished via an arm's length transaction, as one might expect to be the case if the money were intended as an investment in a totally autonomous operation. Chilstrom provided its half of the capitalization, not with the understanding that it would receive a fair rate of return in the form of interest or dividends, but rather, with the understanding that it would equally divide all proceeds of the project after liquidation.

The managerial role that Chilstrom played in its out-of-state joint ventures indicates that all operations were part of a unitary business. Chilstrom's role was not merely one of occasional oversight, contrary to Chilstrom's contention. Although each project manager had certain autonomy in the day-to-day operational decisions, the project managers were ultimately responsible to the partners for the progress of the partnerships. Chilstrom and its joint venture partner

---

[6] The trial court determined that the record failed to show that economies of scale were realized. As stated above, however, we review findings of the WTAC and not the trial court.

were responsible for the hiring, firing and evaluation of each project manager.

As was the case in *Container Corp.*, the management role was based upon Chilstrom's own operational expertise and strategy. Chilstrom was engaged in the same line of work as the projects, but most importantly, without Chilstrom, the joint ventures clearly were not viable operations. According to the terms of each joint venture agreement, both Chilstrom and its joint venture partner appointed representatives who were responsible for all matters arising from the operations of the joint venture. Furthermore, the joint ventures were not a separate business enterprises which sought out projects on its own. Rather, the projects were handed to the joint ventures after the bidding, and hammering out of the details of each contract was completed by Chilstrom and the other joint venture partner. Chilstrom employees were responsible for the bidding and contracting and this work went uncompensated by the joint venture. Chilstrom's Wisconsin operations absorbed all such costs regardless of whether the bid was ultimately accepted or rejected. The typical joint venture agreement provided that the entity was formed for the completion of a certain project. Thus, after completion of a project, it appears that the joint venture dissolved, or at least liquidated all assets, and divided all remaining capital and any profits among the partners. At that point, Chilstrom employees, and not the joint venture as a separate entity, sought out new projects in which to apply their expertise.

We conclude that WTAC's finding of unitariness was correct. The joint ventures were not discrete business enterprises, and instead, were completely dependant upon Chilstrom for all bidding and contracting functions. The joint ventures were also

completely dependent upon Chilstrom for financing and all upper-level management decisions. Thus, Chilstrom provided the money, the customer, the contract, and the direction. In return, the out-of-state ventures provided a source of great profits, which no doubt then became the capital for subsequent joint ventures. Both in-state and out-of-state operations benefitted from the sharing of bidding and contracting operations.[7]

We are unconvinced by Chilstrom's attempt to point out minor differences which may have distinguished any one joint venture project from the rest, and conclude that Chilstrom's Wisconsin operations and the out-of-state operations were inextricably intertwined and meet all tests for unitariness. Therefore, we confirm WTAC's conclusion that Chilstrom's operations, inclusive of its joint ventures, were unitary, and hence, are subject to apportionment without violating Chilstrom's due process rights.[8]

---

[7] It also appears from the record that Chilstrom's only business office was that in Milwaukee, Wisconsin. Project books and records were held by either Chilstrom or its joint venture partner. By the terms of the joint venture agreement for the projects of "Chilstrom Wayne of Moline, A Joint Venture," and for two projects done under the names "Chilstrom-Gateway, A Joint Venture" and "Chilstrom-Gateway Joint Venture #001," the books were kept at the joint venture's "main office," which was listed as Chilstrom's Milwaukee office.

[8] DOR advances the argument propounded by one of the commissioners in a concurring opinion that the enterprises are unitary as a matter of law because they are partnerships. In its reply brief, Chilstrom argues that the unitariness of an enterprise should be determined, not on the basis of its legal form, but on the nature and scope of its activities. This issue, however, was not decided by four of the five commissioners and was not addressed by the trial court. Under these circumstances, we decline to decide it. *See State v. Holland Plastics Co.*, 111 Wis. 2d 497, 504-05, 331

In summary, the factual findings of WTAC were supported by substantial evidence. Its finding that all of Chilstrom's operations were unitary and that the income was apportionable under sec. 72.07(2), Stats., is affirmed.

*By the Court.*—Order affirmed.

---

N.W.2d 320, 324 (1983). Furthermore, resolution of this issue is not necessary to decide the appeal. *See State v. Farr,* 119 Wis. 2d 651, 657, 350 N.W.2d 640, 644 (1984). We have considered the manner in which Chilstrom contributed formation capital to be one of the factors affecting the issue of the unitary character of the enterprises.