MILWAUKEE & SUBURBAN TRANSPORT CORPORATION, Appellant, v. PUBLIC SERVICE COMMISSION, Respondent.*

*March 10—April 4, 1961.*

* Motion for rehearing denied, without costs, on June 6, 1961.

The cause was submitted for the appellant on the briefs of *Quarles, Herriott & Clemons* of Milwaukee, attorneys, and *Maxwell H. Herriott* of Milwaukee, *Browning & Browning* of Chicago, Illinois, and *Madigan & Thorsen* of

Chicago, Illinois, of counsel; for the respondent Public Service Commission on the brief of *John W. Reynolds,* attorney general, and *William E. Torkelson,* chief counsel; and for the respondent city of Milwaukee on the brief of *John J. Fleming,* city attorney, and *Harry G. Slater,* deputy city attorney.

MARTIN, C. J.  Appellant Transport is a public service corporation engaged in the operation of an urban mass-transportation system in Milwaukee county, Wisconsin. On May 14, 1958, it applied to the commission for an increase in its fares.  Hearing was had and on testimony of Transport witnesses indicating that additional revenue was necessary to meet debt obligations and current operating expenses, an interlocutory order was made granting an emergency fare increase on June 17th.  The order provided that if the final order authorized lower fares than therein permitted, Transport would refund the difference to its pass holders.  After a number of additional hearings in September and October, 1958, a final order was issued on January 5, 1959, authorizing increased fares in a lesser amount than that sought by Transport.  Rehearing was denied by order of January 23, 1959.  Some of the fares found reasonable in the final order being less than those authorized in the interlocutory order, Transport is obligated to refund about $60,000 to holders of passes purchased between June 29, 1958, and January 10, 1959.

The fare schedule authorized by the order of January 5, 1959, was found by the commission to result in an operating ratio before income taxes of 93.33 which will provide a return of 7.28 per cent on net investment in transportation property and a return of 8.13 per cent on net capitalization and surplus.  The order rescinded the emergency fare order of June 17, 1958, required Transport to make refund of the

difference between what the purchasers of passes paid under the emergency order after June 29, 1958, and the newly authorized rate, and denied the application of Transport in all other respects.

Transport first maintains that the trial court should have made an independent determination of the company's net investment cost rate base and the net operating revenues which the authorized fares would provide.

It is next contended that the statute exacting an income tax of 50 per cent on all income over an 8 per cent return to the company indicates that the rates should be fixed to produce an 8 per cent return. With this we cannot agree.

We would have no trouble in approving the fares authorized by the commission had they been calculated on a rate base which included the 60 per cent nonoperating portion of the Cold Springs shops and yards and if the sum of $74,898 annually, which will result from the wiping out of a certain insurance reserve over a four-year period, was not included as an item of income making up the total of net income that the commission determined the appellant should have to produce a proper return on its rate base. We do approve of the commission's deduction from the rate base of the average accruals for federal income taxes and vacation pay.

I.

It is appellant's position that the trial court erred in failing to make an independent determination of rate base, operating revenues, and return. One of the cases it relies upon is *Waukesha Gas & Electric Co. v. Railroad Comm.* (1923), 181 Wis. 281, 294, 194 N. W. 846, from which it quotes language to the effect that the court is called upon "to determine for itself" the fair value of the property in order to establish a rate base and "not merely to review the work of

the commission." The language should be read in its entire context. The court began its consideration of the matter by calling attention to certain "fundamental propositions" which were that the establishment of rates is not the function of the courts but of the administrative or legislative branch of the government; that where the proper authority has established a confiscatory rate, the court has the power to set it aside. In any event, since this case was decided prior to the enactment of ch. 227, Stats., it cannot be said to lay down a rule contrary to the provisions of the latter enactment.

Another case, *Commonwealth Telephone Co. v. Public Service Comm.* (1948), 252 Wis. 481, 32 N. W. (2d) 247, does not support appellant's proposition. The court's decision there was based on the view that the commission had failed to make specific findings of the necessary and relevant facts which the court could test on review.

This is a review proceeding under ch. 227, Stats., which "shall be conducted by the court, without a jury and shall be confined to the record." The reviewing court may affirm, or it may reverse or modify the decision of the administrative agency if substantial rights of the appellant have been prejudiced, sec. 227.20 (1), Stats.; and upon such review the court is required to give due weight to the experience, technical competence, and specialized knowledge of the agency, as well as its discretionary authority, sec. 227.20 (2).

Ch. 227, Stats., does not contemplate that the reviewing court make an independent determination of facts. As stated in *Gateway City Transfer Co. v. Public Service Comm.* (1948), 253 Wis. 397, 409, 34 N. W. (2d) 238, it was said:

"As has often been pointed out, on a review based upon the record the court does not retry the case. It is the duty of the trial court to examine the record sufficiently to determine whether the rights of the petitioner have been invaded by an error of the commission."

In other words, the commission is the trier of fact and the court on review is limited in matters of evidence to the question whether the finding is supported by "substantial evidence in view of the entire record." *Graff v. Denny* (1960), 12 Wis. (2d) 65, 69, 106 N. W. (2d) 311, citing the *Gateway City Case, supra.* Such evidence has been defined in *Green Bay & W. R. Co. v. Public Service Comm.* (1955), 269 Wis. 178, 187, 68 N. W. (2d) 828, as follows:

> "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, taking into account the entire record including whatever might fairly be said to detract from its weight. The latter requirement does not, however, furnish a 'calculus of the value' by reason of which a reviewing court can assess the evidence."

The principle contended for by appellant is not the law of Wisconsin under ch. 227, Stats. In *Chicago, M., St. P. & P. R. Co. v. Public Service Comm.* (1951), 260 Wis. 212, 50 N. W. (2d) 416, this court held (syllabus 2):

> "Sec. 227.20, Stats., sub. (1)(d) in particular, prescribing the scope of review by a court of findings and orders of administrative bodies, such as the public service commission, is construed as meaning that the reviewing court must accept findings of fact of an administrative body if they are supported by substantial evidence, even in cases where a constitutional question is involved."

The scope of judicial review of fare and rate orders has been considered as broadened somewhat by the statutory authority of secs. 227.15 and 227.20, Stats., as Mr. Justice CURRIE stated the law to be in *Milwaukee & S. T. Corp. v. Public Service Comm.* (1955), 268 Wis. 573, 580, 68 N. W. (2d) 552:

> "We consider the before-quoted portions of secs. 227.15 and 227.20 (1), Stats., confer the right of judicial review over *such method* of computing depreciation in view of the

contention advanced that the employment of *such method* necessarily results in unreasonable and confiscatory fares." (Emphasis supplied.)

## II.

Sec. 71.18, Stats., levies upon urban-transit companies a special income tax, in lieu of other taxes, of 50 per cent on all taxable income in excess of 8 per cent of the depreciated cost of property used and useful in providing such transportation services.

This statute had its origin in the report made by a commission appointed by Governor Walter J. Kohler in 1954 to study the "mass-transit crisis" confronting city bus systems in Wisconsin generally. The report shows no intent to interfere with the existing statutory jurisdiction of the Public Service Commission over mass-transportation companies. It states:

"The Public Service Commission, it is felt, should exercise its regular functions within the limits of the statutory provisions having in mind the maintenance of financially sound urban-transportation industry and the maintenance of a transit service as efficient as possible."

The report suggested no action by the commission as to rate of return nor any action by the legislature relative to the statutes under which the commission's order was made. The report, together with the enactments of the legislature in response thereto, distinguish prudent investment in mass-transit utilities as requiring a higher rate of return than in other more-stable utilities such as power, light, water, and telephone. The Public Service Commission concedes that a transportation company is entitled to a higher return than such other utilities. The statute indicates that 8 per cent is to be considered a maximum; but there is no mandatory requirement that the commission allow an 8 per cent return.

## III.

There is little dispute in the facts. In authorizing such fares as Transport may charge for a fair return, the commission must first determine the rate base upon which the return is to be calculated. The return may be neither so low as to be confiscatory nor so high as to be discriminatory against the public. The rate base is the net investment cost of the property used and useful in rendering the transportation service for which the fares are fixed.

Appellant attacks three items in the commission's determination of the rate base: (1) Exclusion of $277,061 of its net investment cost in the Cold Springs shops and yards; (2) deduction of $983,849 representing average accrued vacation pay and federal income tax; (3) reduction by $74,898 of the adjusted reserve fund maintained by Transport as a self-insurer in respect of claims arising from its operation of motor vehicles.

### A.

The Cold Springs shops were built by Transport's predecessor about 1912. Because of conversion of the system from streetcars to trackless trolleys and buses, these shops and yards are larger by about 60 per cent than is now required. The commission's exclusion of $277,061 from the net investment rate base represents the 60 per cent of such property not now required for Transport's operations. There is no dispute that only an undivided 40 per cent of the Cold Springs shops and yards is now used for transportation purposes.

Transport contested the exclusion of this $277,061 on the ground that no severable portion of the Cold Springs property is not actually used for transportation service and that if the property could be sold, new shops and yards, with

less area but with capacity adequate for present purposes, would cost more than the $538,858 net investment cost allocated to the Cold Springs property. The record discloses that the cost of new and adequate shops and yards would be between $1,000,000 and $1,500,000.

The commission maintains that since property included in the rate base must be "used and useful," the value of the nonused, undivided 60 per cent of the Cold Springs property should be deducted. To a large extent this is remanagement of the company. The commission relies on *Public Service Comm. v. Montana-Dakota Utilities Co.* (N. D. 1959), 100 N. W. (2d) 140, as authority for excluding the investment in a nonseverable portion of a utility plant in the determination of rate base. There a gas utility installed a pipeline which was four inches larger in diameter than required by existing or foreseeable demands. Since the investment was about $750,000 more than would have been required at the time or in the foreseeable future, the North Dakota commission deducted that amount from the rate base.

We have a different situation here. At the time the Cold Springs shops were built and for some time thereafter, the property was used and useful. The decrease in its use has been occasioned by the gradual conversion of the transportation system from streetcars to trackless trolleys and motorbuses. While the property is being used, there is more space than is presently necessary. Some equitable basis must be found to write off the 60 per cent over a period of time. This court would approve of some plan that would do so over a period of six to ten years, but we feel that deducting 60 per cent of the value of the property from the rate base now is arbitrary and capricious.

In *Wisconsin Telephone Co. v. Public Service Comm.* (1939), 232 Wis. 274, 348, 287 N. W. 122, 287 N. W. 593, this court stated that a public utility, being required to provide service when and as demanded by the public, must have

some latitude with respect to plant management; that in determining the rate base, property should not be excluded merely because at the moment it is not in actual service. We held that the commission could not construct a hypothetical plant which would theoretically render equivalent service and on that basis hold that any portion of the existing property was excess, and—

"A reasonable rate is one based on reason as applied to the property of the utility. While the company must bear the burden of an unreasonable extension of its plant, and the risk that portions of it prudently acquired may become obsolete or not useful, it should not be penalized for failure exactly to anticipate future demands for service in a period of depression."

In the instant matter there is even more justification for including the Cold Springs property in the rate base. This was no "unreasonable extension" of the company's investment; at the time it was acquired it was needed for its operations.

The commission also refers to testimony that Transport permitted portions of the Cold Springs property to be used by affiliated nonoperating corporations without payment of rent. The record shows, however, that for fare purposes the commission used the income of such affiliated companies to reduce Transport's operating expenses and increase its operating income. We may observe that the commission's position is inconsistent in treating the income of such companies as part of Transport's operating net income and treating the $277,061 of net investment as nonoperating items.

### B.

The rate base used by the commission in its calculation of the return also reduced Transport's net investment cost figure by $983,849, $675,652 representing the average accrued vacation pay for years ended October 1958, and

$308,197 representing 50 per cent of the average accrued federal income tax.

Substantially all of Transport's revenue is either collected from users of the service as they ride or in advance through sale of tickets or passes. Its charges are made to operating expense as items of expense accrue rather than when disbursement therefor is made. The commission argues that since the company collects its revenues at the time, or in advance, of furnishing the service and pays the cost of rendering that service at a later time, the interval furnishes a continuing supply of capital which should be deducted from the rate base because otherwise Transport will receive a return on capital it has not furnished.

We agree with the commission on this point. The accruals in question represent customer contributions not entitled to earn a return. They are not capital supplied by the stockholders, and to permit them to be included in the rate base would give the stockholders a return on money they did not invest. It is true that, when customers pay their fares at the time or in advance of their rides, the company becomes the owner of such funds and any accruals thereof reserved until charges are paid therefrom. It may be that such reserves are invested in plant of the company, but that does not change the source and character of the funds. The funds, on receipt from the customers, are merely set aside for the meeting of obligations due and to become due, an accrual for the payment of accounts owing.

This is practically a matter of common knowledge. See Barnes, The Economics of Public Utility Regulation (1942), pp. 423, 424, where it is said, among other things:

"Property used in the utility service but acquired without cost to the company may have been donated by some governmental unit, supplied by patrons, paid for with customers' deposits, or purchased with funds accumulated for depreciation, or for other, reserves.

"The fair and equitable disposition of this question would appear to be the exclusion of donated property from the inventory. Obviously such property was not given for the purpose of enabling the corporation to exact higher charges; . . .

". . . Though the title to such property is usually in the utility, a majority of the commissioners ruling on the matter have held that customers' contributions should be deducted from the rate base, unless the utility is paying interest on such contributions and is under obligation to refund the payments to the customers at some future date."

## C.

In 1955 Transport established a reserve fund as a self-insurer for the payment of injury and damage claims. The commission found that the fare structure authorized in its order would produce an annual net operating revenue of $512,572. Transport contends it would produce only $437,674, or $74,898 less. The commission found:

"The injuries and damages expense which will be considered as chargeable to reserve will be $74,898 less than the amount reflected in the staff income account. By this adjustment, excess accruals for this expense during the past four years will be used up during the following four-year period. It will be considered that this adjustment will begin as of January 1, 1959, but that no charges should be made to expense for increasing that special reserve subsequent to March 31, 1958. The result of this procedure will be that all injuries and damages expenses by the company will be chargeable to expenses directly or to a reserve created by charges to operating expenses."

In our opinion, it cannot be said that the present amount of the fund is too large. The fact that in four years no claims have been made and no payments expended from the fund is no assurance that none will be required in the future. We think it is in the interest of the traveling public to be

protected by the present reserve; that it is more important to the public and better business for the company to keep the reserve at its present level than to effect a reduction of 25 per cent per year for the next four years. This is especially true in view of the fact that the company cannot recapture any of one year's losses in the following year.

We do not feel, however, that the fund should be increased. After there has been a further experience the commission will be in a better position to judge what reserve is necessary for these purposes.

*By the Court.*—Judgment reversed, and cause remanded with instructions that the matter be returned to the commission for further proceedings not inconsistent with this opinion.

FAIRCHILD, J. (*concurring*). 1. *With respect to the partial exclusion of the net investment cost in the Cold Springs shops and yards.* I would prefer that the court not express approval in advance of a plan of adjustment which the commission has not yet considered. At this point, it seems sufficient to point out that there is no substantial evidence that it is feasible to devote parts of the facility to other purposes nor that it is imprudent to use it rather than to build or buy a different one.

2. *With respect to the reserve fund for payment of liability for injury and damage.* The liability of the company arising from any one incident in an amount between $100,000 and $1,000,000 is covered by insurance. The company also maintains a cash fund designated "Injuries and Damage Reserve Fund" in which a percentage of revenue is regularly deposited. This fund has provided more than enough money to settle all liability claims up to the time of this proceeding. The provisions for this fund are not in controversy. Starting in 1955, however, the company began to accrue an additional reserve equal to one half of one per cent of its revenues and

considered to be a provision against liability between $25,000 and $100,000. This reserve has been built up to $299,592. Accruals to this reserve were charged as expense. It would follow that if this charge were not a proper expense item, the income for those years was larger than reflected by the books, and an addition to surplus would result. The commission contends, however, that since this reserve was intended for losses, it should now be used for that purpose. The commission decided that four years was a fair period over which to spread the use of this reserve. In so doing the commission would require the company to reflect $74,898 less expense each year by drawing upon a reserve which the commission, in effect, holds should have been surplus. The commission's determination that the provision by liability insurance for the largest losses plus the deposits in the Injuries and Damage Reserve Fund are sufficient appears to be based on substantial evidence and within the discretion of the commission. Prospectively the commission can properly reject the accrual to the additional reserve as an item of expense in computing the anticipated return. The commission cannot, however, require that surplus earned in the past be devoted to an artificial reduction in expense in the future. *Wisconsin Telephone Co. v. Public Service Comm.* (1939), 232 Wis. 274, 303, 287 N. W. 122, 287 N. W. 593.

I am authorized to state that Mr. Justice CURRIE joins in this opinion.