453 So.2d 799 (1984)
GULF POWER Company, Appellant,
v.
FLORIDA PUBLIC SERVICE COMMISSION, and Citizens of the State of Florida, Appellees.
No. 63729.
Supreme Court of Florida.
July 12, 1984.
*800 C. Roger Vinson and G. Edison Holland, Jr. of Beggs & Lane, Pensacola, for appellant.
William S. Bilenky, Gen. Counsel, Roger Howe, Legal Director and Kathleen Villacorta, Associate Gen. Counsel, Florida Public Service Com'n, Tallahassee, and Jack Shreve, Public Counsel and Suzanne S. Brownless, Associate Public Counsel, Tallahassee, for appellees.
ADKINS, Justice.
We have for review the Florida Public Service Commission's order no. 11498, issued January 11, 1983, in which the Public Service Commission (hereinafter the PSC) authorized a rate increase sought by Gulf Power Company (hereinafter Gulf). We have jurisdiction pursuant to article V, section 3(b)(2), Florida Constitution.
In June, 1982, Gulf filed its petition for a rate increase that would provide $36,944,000 additional annual revenue. In January, 1983, the PSC, in order no. 11498, authorized an increase in gross revenues of $3,366,000 annually. Gulf then filed a petition for reconsideration which was denied by the PSC in order no. 11936. This review involves only two aspects of the PSC's order no. 11498: first, the downward adjustment made by the PSC based on Gulf's unused capacity, which exists as a result of Gulf's 50% ownership in two units at Plant Daniel located in Mississippi; and, second, the PSC's adjustment to the coal inventory levels *801 used in Gulf's determination of working capital.
Gulf has petitioned for rate relief seven times in the last twelve years. Each case required the Commission to deal with Gulf's status as a wholly-owned subsidiary of the Southern Company. Southern is a holding company which wholly owns four electric utilities and a service company. Southern can be viewed as a single utility company with generating plants situated in four states.
Each subsidiary company plans for construction to serve its own load but the plans are coordinated centrally through Southern. Units are added according to an agreed upon plan. All sales to non-affiliated companies are made by Southern, not the individual subsidiaries. The Intercompany Interchange Contract (hereinafter, IIC), is a contract which Gulf entered into and which guides its interactions with other Southern subsidiaries. Gulf contributes its electrical generation to a pool to meet the needs of all four companies' customers.
Gulf raises the following arguments in its appeal: 1) that the adjustment of $5,391,931 for "unused capacity" is arbitrary and unsupported by competent substantial evidence; 2) that Gulf Power Company has no "unused capacity" and no excess generating reserves, and therefore, the penalty imposed by the commission is unjustified and improper; 3) that the coal inventory adjustment to the working capital component of rate base made by the commission was erroneous and contrary to the evidence; and 4) that the commission's denial of rates that will produce a reasonable rate of return for Gulf Power Company constitutes confiscation in violation of the fifth and fourteenth amendments of the Constitution of the United States, articles I and X of the Constitution of the State of Florida, section 366.041, Florida Statutes (1981), and exceeds its authority. We disagree with the appellant's assertions and affirm the order of the PSC.
Plant Daniel is an electric generating facility comprised of two coal-fired generating units, each rated at approximately 500 megawatts. Plant Daniel was originally designed to satisfy the generating needs of Gulf's sister company, Mississippi Power Company, which was responsible for the plant's design, construction and fuel supply. Mississippi Power's generation needs were not as great as first anticipated and Gulf was offered a joint ownership. In 1975, Gulf agreed to purchase an undivided one-half interest in the two units to be constructed. Demand did not increase as expected and, in 1976, Gulf and Mississippi agreed to defer the in-service date of Unit 2 from 1979 to 1980. Mississippi Power would complete and own Unit 1 when it became operational in 1977. Thereafter, when Unit 2 was completed, Gulf and Mississippi would transfer assets as necessary to effectuate a joint 50% ownership in each unit. Unit 2 was again deferred and began commercial operation in June 1981.
Gulf's purchase of the one-half interest in Plant Daniel increased its generating capacity by 511 megawatts. Gulf sold 238 megawatts to Florida Power and Light Company and Jacksonville Electric Authority through a unit sales contract. Another 186 megawatts were sold to Gulf's sister companies through the ICC. This left 87 megawatts to serve Gulf's customers.
Under the IIC, the capacity of the Southern system is equalized among the four operating companies. If, at the time of the peak demand on the system, the excess of generating capacity over the actual demand on the system was 23%, those companies whose reserve margins were below 23% would be required to purchase from those utilities whose reserve margins were above 23%, sufficient additional capacity to raise their reserve margin to that level. Each company supports the system-average reserve margin. These purchases and sales of capacity are made at average embedded cost. In Gulf's case, the addition of Plant Daniel in 1981 changed Gulf from a net purchaser to a net seller of capacity under the ICC.
In the PSC's order no. 11498 it determined, among other things, that due to faulty load forecasting, Gulf had failed to *802 recognize the extent of the excess capacity which would be generated as a result of the purchase of Plant Daniel. The PSC found that this failure resulted in the sale of 186 megawatts to Gulf's sister companies at a price below the cost of generation of that capacity. It further found that Gulf's retail customers should not be required to make up the difference in the form of increased rates. As a result of these conclusions the PSC adjusted Gulf's net income upward by the amount of $5,391,931, which, in turn, reduced its allowable rate increase.
Gulf asserts that the PSC's adjustment of $5,391,931 for unused capacity is arbitrary and unsupported by competent substantial evidence. It claims that IIC capacity payments are calculated at 16% on equity on embedded costs while retail rates authorized by the PSC are 15.85% on equity on embedded costs; therefore, the PSC is criticizing Gulf for selling capacity too cheaply when, in actuality, it is priced higher under the IIC than under the retail rates set by the PSC. Gulf states that the PSC has also attempted to justify its action by determining that there was an absence of proof that incremental-cost sales from Plant Daniel could not have been made, and that there is no evidence to support either of the PSC's justifications for its action.
Gulf relies on Madison Gas & Electric Co. v. Public Service Commission, 109 Wis.2d 127, 325 N.W.2d 339 (1982), to support its argument. That court found that the adjustment made by the Wisconsin PSC was not supported by substantial evidence and that the shifting of a part of the cost of maintaining the utility's excess capacity from the ratepayers to the shareholders was arbitrary and outside the PSC's discretionary authority. However, the Wisconsin court further stated that it based its decision on the two-step test enunciated in Milwaukee Suburban Transport Corp. v. Public Service Commission, 13 Wis.2d 384, 108 N.W.2d 729 (1961). The court held in that case that the PSC has the authority to shift some of the cost of excess capacity to the transportation company's shareholders where (1) the excess generating capacity was imprudently acquired, or (2) the excess capacity was not used or useful in serving the public. 13 Wis.2d at 393, 108 N.W.2d at 734. In Madison Gas the court found that there had been no examination based on either of those two requirements. Because of the absence of a reasoned determination of who shall bear the burden of paying for all or part of excess capacity, the court found the PSC's adjustment to be arbitrary.
We find that Gulf's reliance on Madison Gas in the instant case is misplaced. Here, the PSC has undertaken a reasoned determination and we find that its conclusions are not arbitrary. The PSC stated in its order no. 11936 denying Gulf's petition for rehearing of order no. 11498:
As we said in Order No. 11498, we do believe that Gulf's purchase of a portion of Plant Daniel will benefit the rate payers in the long run. However, the issue in this case is whether Gulf carried its burden of proof as to whether it took every reasonably available prudent action to minimize the adverse short-term consequences of purchasing a portion of Plant Daniel. For the reasons set forth below, we do not believe Gulf carried its burden of proof on this issue.
In short, Gulf failed to prove that, if it had made a timely effort to sell an additional 186 MW off-system at marginal cost, it would have been unable to do so. While Mr. Parsons testified extensively concerning the Company's efforts to make off-system sales, his testimony missed the point because he assumed that Gulf's marketing efforts commenced in a timely fashion. This assumption was contradicted by the information elicited during the cross-examination of Mr. Oerting. During Mr. Oerting's cross-examination, it was shown that Gulf was repeatedly advised by the Commission that its forecasts of future load growth contained in its 1975, 1976 and 1977 Ten Year Site Plans were too high for planning purposes.
... .

*803 The consequences of Gulf's reliance on overstated load forecasts is clearly demonstrated by the record.
Our point is that, had Gulf heeded the advice of the Commission in 1977, they would have realized much earlier than late 1979 that not all the capacity from Plant Daniel would be needed in 1981. The Company could then have been in a position to either defer Plant Daniel to a later in-service date or to pursue the sale of a larger amount of unit power to other utilities.
... .
this rate case, Gulf's rate payers are being asked by it to pay for a portion of Plant Daniel not presently needed to serve them as a result of the Company's imprudent load forecasting. This we will not allow and therefore we reaffirm the adjustment for unused capacity we made in this Order No. 11498.
We have repeatedly stated the standard of judicial review by which we are guided when we review PSC orders. We will not overturn an order of the PSC because we would have arrived at a different result had we made the initial decision and we will not reweigh the evidence. Our task is to determine whether competent substantial evidence supports a PSC order. Citizens v. Public Service Commission, 435 So.2d 784 (Fla. 1983); Citizens v. Public Service Commission, 425 So.2d 534 (Fla. 1982); Shevin v. Yarborough, 274 So.2d 505 (Fla. 1973).
The PSC was presented with conflicting evidence. It understood Gulf's proposal, identified its concerns, and gave Gulf every opportunity to explain why its customers should support more of Plant Daniel than the pro rata share of those units committed to their service. Gulf did not provide an answer that was satisfactory to the PSC.
Gulf states that capacity under the IIC is priced higher than under retail rates set by the Commission. The return may be higher, but there is no evidence that the actual rates, even on an embedded cost basis, are higher. In fact, Gulf sells Plant Daniel capacity costing $371 per kilowatt at $200 per kilowatt through the IIC. The IIC, pricing according to average embedded costs, does not recognize the full price of Plant Daniel, and the difference has to be picked up by either the ratepayers or the stockholders. Had Gulf not relied on improper forecasts or had it sold all of Plant Daniel through unit power sales, it would not have had to rely upon the IIC to market the capacity below cost. The PSC resolved this dilemma in the ratepayers favor.
There is no clear consensus among the various jurisdictions on the issue of excess capacity. See 9 PUR Digest 3d Valuation § 211 (1983). The decision whether or not to allow excess capacity to be included in the rate base, in most cases, hinges on whether imprudent managerial decisions created the capacity which is not used or useful at the time. See, e.g., Re Dayton Power and Light Co., 45 PUR 4th 549 (Ohio PSC 1982) (no adjustment was made for the utility's excess capacity because there was no showing that applicant's capacity planning had been imprudent); Re Otter Trail Power Co., 44 PUR 4th 219 (N.D. PSC 1981) (an electric utility was required to assume some risk for erroneous load forecasts as there must be some incentive for the pool and the individual utility member to strive continuously for accurate and precise management of the timing of new base-loan plants); Re Kansas City Power and Light Co., 38 PUR 4th 1 (Mo. P.S.C. 1980) (imprudent management caused excess capacity to be excluded from rate base, among other things, when management knew there would be excess capacity when the plant was completed and the company sold capacity at a loss to non-jurisdictional customers). The record demonstrates that the PSC did find imprudent managerial decisions resulting from faulty load forecasting. We agree with that finding and the PSC's resulting adjustment.
Gulf's second contention is that there was actually no excess capacity. We disagree. After Gulf's sale of 238 megawatts through unit power sales and 186 *804 megawatts through the IIC, 87 megawatts of Plant Daniel remained to serve Gulf's customers. This placed Gulf's reserve margin at 23%, a reasonable level. The $5,391,931 adjustment does not apply to these 87 megawatts; it applies to the additional cost of the 186 megawatts sold to sister companies that Gulf expects its customers to make up through retail rates.
One possible area of dispute in the PSC's adjustment of excess capacity is whether all sales of capacity through the IIC should be assumed to emanate from Plant Daniel. This is however a reasonable conclusion from the evidence before the PSC. Before Plant Daniel, Gulf purchased capacity; after Plant Daniel, Gulf sold capacity. The fact that Gulf chose to sell this capacity through the IIC at the average cost of all of its units does not alter the fact that Plant Daniel was the incremental addition that made this possible.
Gulf next argues that the PSC erred in not allowing it to include in rate base all of its claimed fuel inventory. The PSC made adjustments to Gulf's proposed coal inventory which was to be included in its working capital allowance. Order no. 11498 stated in part:
Fuel inventory is an element of working capital and, as such, the Company should earn a return on its investment in fuel stocks that are reasonably and prudently included in fuel inventory. Determining the amount of fuel inventory to include in the rate base is not an easy task. On one hand, there is the overriding concern that fuel inventory be adequate to reasonably ensure the continuous generation of electricity to avoid disruptions of service. On the other hand, is the desire to not require the ratepayers to support investment in fuel inventory beyond the amount necessary for the dependable operation of the generating system.
... .
... Mr. Parsons testified that the 60-day nameplate policy has been continued not on the basis of any objective study weighing the importance and economic value of those factors; rather, the policy is based on the collective wisdom of the company's management.
With all deference to Gulf's management, a policy followed by management that has such a tremendous financial impact on ratepayers must be substantiated with more than an assertion that it is the result of collective management wisdom. We do not wish to substitute our judgment for that of management. However, we insist that management's judgment be substantiated in a way that permits intelligent review of it. In this context, this can best be accomplished by performance of an analysis or study that identifies all of the major factors that influence development of a coal inventory policy, indicates the relative weight that should be attached to each factor, and evaluates the benefits and costs, in light of these factors, associated with a range of alternate coal inventory levels. The reasons why a particular factor is selected, why a particular weight is attached to it, and how it is included in a cost benefit analysis of alternative inventory levels should be clearly stated. In the absence of that kind of empirical support for its position, we find that the Company failed to carry its burden of proof with respect to the soundness of its 60-day nameplate policy.
... .
Staff also urged us to reduce inventory by an amount necessary to bring it down to a 90-day projected burn level. A 90-day projected burn policy would require the Company to maintain sufficient coal on hand to meet the expected burn for the immediately succeeding 90 days. While the 60-day nameplate level is a relatively static target, a 90-day projected burn policy implies a rolling adjustment. Adoption of Staff's recommendation would reduce inventory to 756,649 tons with a value of $46,812,917. However, we reject Staff's recommendation for the same reason that we rejected the Company's 60-day nameplate policy, namely, that it is not supported in the record by the sort of objective evidence *805 that would permit us to make an intelligent assessment of it. Staff must provide the same sort of analysis in support of its proposed inventory policy that we earlier required from the Company.
We are left then with two proposed inventory values, one of $64,801,764 based on a 60-day nameplate level, and the other of $46,812,917, based on a 90-day projected burn level, the difference between the two being $17,988,847. Neither of the two policies is supported by sufficient evidence to allow us to say it ought to be the policy followed by the Company. We, therefore, will reduce the Company's proposed 60-day nameplate value by one-half of the difference between it and the Staff's proposed 90-day projected burn value, $8,994,424. We are in effect reducing the Company's proposed inventory value because the Company failed to prove that its 60-day nameplate inventory policy was a reasonable and prudent policy. In so doing, we neither endorse nor reject any particular coal inventory policy; the record does not permit us to determine what the Company's coal inventory policy ought to be. However, we cannot permit the Company to benefit from its failure to carry its burden of proof. Therefore, we have reduced inventory to a level that we believe to be within a zone of reasonableness. We hope that we will receive a full evidentiary presentation, as outlined above, in the Company's next rate case so that we may lay this issue to rest.
The PSC was confronted with competing testimony from Gulf and the commission staff regarding what is to be a reasonable coal inventory. It is the PSC's prerogative to evaluate the testimony of competing experts and accord whatever weight to the conflicting opinions it deems necessary. See United Telephone Co. v. Mayo, 345 So.2d 648, 654 (Fla. 1977). Although the PSC rejected both Gulf's 60-day nameplate policy and the staff's 90-day projected burn level as necessarily proper, it was presented with sufficient evidence to enable it to choose a reasonable alternative. Inasmuch as the PSC was not convinced that Gulf's position was supported by substantial competent evidence, it was left with three possible alternatives; to allow Gulf's fuel inventory proposal without competent substantial evidence, to allow Gulf no coal inventory at all or, to make some other reasonable determination. The PSC properly recognized its responsibility of not only setting fair and reasonable rates but also of "promot[ing] the convenience and welfare of the public and secur[ing] adequate service or facilities to those reasonably entitled thereto". § 366.05(1), Fla. Stat. (1981). Cognizant of the fact that Gulf needs coal to fire its base-load facilities, the PSC was precluded by statute and common sense from totally disallowing all funds for coal inventory.
In General Development Utilities, Inc. v. Hawkins, 357 So.2d 408 (Fla. 1978), this Court held that the PSC's selection of an equity/debt ratio, in determining a water company's request for a rate increase, was arbitrary and violative of due process. That case is distinguishable from the instant one in that we reached our conclusion because the PSC's decision was based on facts outside the record relating to other utilities generally. Here the PSC made a reasoned judgment based on competent substantial evidence within the record which related specifically to Gulf.
Under section 120.68(12), Florida Statutes (1981), this Court may not now substitute its judgment for the PSC's own action taken within the statutory range of discretion. See Citizens v. Public Service Commission, 435 So.2d 784 (Fla. 1983); Florida Real Estate Commission v. Webb, 367 So.2d 201 (Fla. 1978). We find that the PSC was within its discretionary authority on this issue.
Gulf's final argument is that the PSC has denied it a reasonable rate of return and that such denial constitutes confiscation and violates the United States and Florida Constitutions. We disagree.
If an adjustment is made for excess Plant Daniel capacity and for fuel inventory, a rate of return calculated without that *806 adjustment will be less than the return calculated with it. The legal issue raised is one of confiscation, but Gulf's entitlement to a fair return on equity presumes that it will be tested consistently with the standards under which it was set. Gulf has the option to make expenditures that will not be allowed for regulatory purposes, that will effectively, when disallowed, reduce its return in the market place. But the fact remains that at the approved levels of rate base, capital structure and operating expenses, the approved rate award will afford Gulf the opportunity to earn 15.85% on equity.
This Court has held that the rate base upon which a utility should be afforded an opportunity to earn a return is not every dollar of investment made but only that investment in assets devoted to public service at the time rate base is quantified. United Telephone Co. v. Mayo; Keystone Water Co. v. Bevis, 278 So.2d 606 (Fla. 1973). Order no. 11498 allows Gulf an opportunity to earn a return on every dollar of investment in assets committed to provide service to its customers and allows it to include a 23% reserve margin. This includes, at full incremental cost, that portion of Plant Daniel necessary to reach that reserve level. Gulf has not suffered confiscation of its property.
Gulf is correct when it states that that portion of Plant Daniel associated with the 186 megawatts sold under the IIC, along with associated operating and maintenance expenses, has been left in rate base, capital structure and net operating income calculations. Having determined that 186 megawatts of Plant Daniel is above and beyond the capacity necessary to maintain an adequate reserve margin for Gulf, the PSC was faced with several alternatives. It could have excluded the revenues associated with the IIC from test year revenues while adjusting rate base, capital structure and operation and maintenance expenses to also exclude that portion related to the 186 megawatts of Plant Daniel. Alternatively, it could have imputed the $5,391,931 marginal cost revenues associated with the 186 megawatts to the test year by lowering the revenue requirement by that amount, while leaving rate base, capital structure and operation and maintenance expenses the same. This latter alternative was taken by the PSC. It has the net effect of excluding from rate base that portion of Plant Daniel determined to be nonused and useful by present customers. See § 366.06, Fla. Stat. (1981).
Gulf has mischaracterized this $5,391,931 revenue imputation as a penalty. It is, rather, an adjustment to rate base to exclude capacity which is not currently serving customers. It is clearly within the delegated authority of the PSC to make such an adjustment.
Gulf has failed to meet the burden required to overcome the presumption of validity attached to PSC orders and to demonstrate that order no. 11498 is not supported by competent substantial evidence of record or, that it violates the essential requirements of law. City of Tallahassee v. Mann, 411 So.2d 162 (Fla. 1981); Surf Coast Tours, Inc. v. Florida Public Service Commission, 385 So.2d 1353 (Fla. 1980).
Accordingly, we approve the PSC's order no. 11498 in all respects.
It is so ordered.
BOYD, C.J., and ALDERMAN, McDONALD, EHRLICH and SHAW, JJ., concur.
OVERTON, J., concurs in part and dissents in part with an opinion.
OVERTON, Justice, concurring in part, dissenting in part.
I concur with the majority opinion except for that part which holds that the management decision to have a 60-day nameplate level of fuel was not supported by the evidence. I find that conclusion to be erroneous. The determination as to the amount of fuel inventory the utility should have on hand is a management decision which cannot be rejected by the Public Service Commission without a finding that the utility management acted unreasonably in *807 making the inventory decision. In my opinion, the burden is on the Public Service Commission to make a finding of unreasonableness with regard to the inventory decision.