# Supreme Court of Florida

————————

Nos. SC15-95, SC15-113, SC15-115

————————

**CITIZENS OF THE STATE OF FLORIDA,**
Appellant,

vs.

**ART GRAHAM, ETC., et al.,**
Appellees.

————————

No. SC15-274

————————

**FLORIDA INDUSTRIAL POWER USERS GROUP,**
Appellant,

vs.

**ART GRAHAM, ETC., et al.,**
Appellees.

[May 19, 2016]

POLSTON, J.

This case is before the Court on appeal from three orders of the Florida

Public Service Commission (PSC).[1]  The PSC approved the recovery of Florida

———————————————

1.  We have jurisdiction.  See art. V, § 3(b)(2), Fla. Const.

Power and Light's (FPL) costs incurred through its joint venture with an oil and natural gas company to engage in the acquisition, exploration, drilling, and development of natural gas wells in Oklahoma. The recovery as fuel costs paid by FPL's customers in its utility rates were considered by the PSC to be a long-term physical hedge. Treating these activities as a hedge requires FPL's end-user consumers to guarantee the capital investment and operations of a speculative oil and gas venture without the Florida Legislature's authority. Accordingly, we reverse.

## I. BACKGROUND

Each year, the PSC creates a docket (fuel docket or fuel clause) to review and allow cost-recovery of fuel expenditures as well as to review hedging activities intended to minimize fuel price volatility by Florida's investor-owned utilities. In 2014, FPL filed its petition seeking cost recovery for its fuel costs, and, in determining the proper amount for which FPL could receive cost recovery, the PSC approved FPL's hedging activities.

In the 2014 fuel clause proceeding, FPL also filed a petition requesting approval and recovery of a specific gas reserves investment, the Woodford Project. This petition requested a determination that FPL would be eligible to recover, through the fuel clause, its "exploration expense, depletion expense, operating expenses, G&A, taxes, transportation costs and a return on the unrecovered

investment, including working capital" for investments in the exploration, drilling, and production of natural gas in the Woodford Shale Gas Region in Oklahoma. The Woodford Project is a joint venture agreement between FPL and PetroQuest, a publically traded independent oil and natural gas company. Pursuant to the agreement, FPL would invest directly in PetroQuest's shale gas reserves in the Woodford Shale region and in return receive the rights to a share of the physical gas produced.

FPL alleged that it was looking for opportunities to acquire natural gas at production costs (as an investor), rather than at market prices (as a purchaser), in order to help insulate customers from the volatility of the gas market. Specifically, FPL asserted that its ownership interest in the Woodford Project would operate as a long-term physical hedge against the market volatility of natural gas prices used to provide electric service to FPL's customers. FPL also asserted that the Woodford Project would benefit its customers by providing natural gas at a lower cost than market prices.

Citizens of the State of Florida, through the Office of Public Counsel, (Citizens), Florida Industrial Power Users Group (FIPUG), and Florida Retail Federation (FRF) participated as intervenors in the proceedings. Citizens and the Florida Industrial Power Users Group (FIPUG) moved to dismiss the Woodford Petition, alleging that the PSC lacked the authority to consider and approve the

project. The PSC denied the motion, concluding that it had jurisdiction under its statutory authority to set rates for public utilities.

Thereafter, the PSC heard FPL's testimony that investment in the Woodford Project would provide fuel savings and price stability, effectively acting as a long-term hedge. The PSC also heard testimony from Appellants that the costs associated with the Woodford Project do not satisfy the criteria for fuel clause recovery and that these projected costs went beyond PSC policy for dealing with fossil fuel-related costs normally recovered through base rates. Following the two-day evidentiary proceeding, the PSC approved the Woodford Project, concluding as follows:

> We find the Woodford Project, in the manner described in the FPL petition and evidence on the record, is expected to produce customer benefits and is in the public interest. We find its costs are recoverable through the Fuel Clause. In order to provide additional protections for FPL customers, we find it necessary to add two conditions for compliance with this Order. First, FPL shall add the appropriate subaccounts, under the FERC system of accounting, which will correspond on a one-on-one basis with the accounts used by the Gas Reserve Company (GRCO). Second, FPL shall utilize an independent auditor in performing the audits provided in the agreement and shall work with [PSC] staff to develop the scope of the audits.

## II. ANALYSIS

Appellants argue that the PSC lacks the authority to allow FPL to recover the capital investment and operations costs of its partnership in the Woodford gas reserves through the rates it charges consumers. We agree.[2]

This Court has repeatedly stated that, although "orders of the Commission come before this Court clothed with the statutory presumption that they have been made within the Commission's jurisdiction and powers, and that they are reasonable and just and such as ought to have been made," "[s]uch deference . . . cannot be accorded when the commission exceeds its authority. At the threshold, we must establish the grant of legislative authority to act since the [C]ommission derives its power solely from the legislature." United Tel. Co. of Fla. v. Pub. Serv. Comm'n, 496 So. 2d 116, 118 (Fla. 1986); see also Sprint-Florida, Inc. v. Jaber, 885 So. 2d 286, 290 (Fla. 2004). Whether the PSC has the authority to act is a question of law, which is subject to de novo review. See D'Angelo v. Fitzmaurice, 863 So. 2d 311, 314 (Fla. 2003).

Chapter 366, Florida Statutes (2014), provides the PSC with jurisdiction to regulate and supervise each public utility with respect to its rates and service and to prescribe a rate structure for all electric utilities. § 366.04(1)-(2), Fla. Stat. (2014);

---

2. We reject, without further comment, all the other arguments raised in the briefs by the parties.

Pub. Serv. Comm'n v. Bryson, 569 So. 2d 1253, 1254 (Fla. 1990) (noting that "[i]n section 366.04(1) . . . the [L]egislature granted the PSC exclusive jurisdiction over matters respecting the rates and service of public utilities"). The regulation of public utilities is in the public interest and "an exercise of the police power of the state for the protection of the public welfare and all the provisions [of chapter 366] shall be liberally construed for the accomplishment of that purpose." § 366.01, Fla. Stat. (2014). The PSC may set rates that are "fair, just, and reasonable." See § 366.06(1), Fla. Stat. (2014) ("[T]he commission shall have the authority to determine and fix fair, just, and reasonable rates that may be requested, demanded, charged, or collected by any public utility for its service."); see also § 366.03, Fla. Stat. (2014) ("All rates and charges made, demanded, or received by any public utility . . . shall be fair and reasonable."); § 366.05(1), Fla. Stat. (2014) ("In the exercise of such jurisdiction, the commission shall have power to prescribe fair and reasonable rates and charges."). In fixing the fair, just, and reasonable rates charged for service by the "public utilities under its jurisdiction, the commission is authorized to give consideration, among other things, to . . . the cost of providing such service and the value of such service to the public[.]" § 366.041(1), Fla. Stat. (2014).

Section 366.02(1), Florida Statutes (2014), defines a "public utility" as "every person, corporation, partnership, association, or other legal entity and their

lessees, trustees, or receivers supplying electricity or gas (natural, manufactured, or similar gaseous substance) to or for the public within this state[.]" An "electric utility" is "any municipal electric utility, investor-owned electric utility, or rural electric cooperative which owns, maintains, or operates an electric generation, transmission, or distribution system within the state." § 366.02(2), Fla. Stat. (2014).

It is undisputed that FPL is an electric utility. It is also undisputed that the PSC's ratemaking authority encompasses the authority to examine fuel cost expenditures and approve cost recovery to compensate for utilities' fuel expenses through the fuel clause. See Gulf Power Co. v. Fla. Publ. Serv. Comm'n, 487 So. 2d 1036, 1037 (Fla. 1986).

However, the PSC does not have the statutory authority to approve cost recovery for FPL's investment in the Woodford Project. As explained above, section 366.06(1) provides that the PSC has the authority to determine and fix fair, just, and reasonable rates for public utilities, and section 366.02(2) defines an electric utility as owning, maintaining, or operating an electric generation, transmission, or distribution system. Therefore, under the plain meaning of these two statutes, cost recovery is permissible only for costs arising from the "generation, transmission, or distribution" of electricity. The Woodford Project's exploration, drilling, and production of natural gas fuel in Oklahoma do not

constitute generating, transmitting, or distributing electricity in Florida as the meaning of those terms are plainly understood. In other words, the exploration, drilling, and production of fuel falls outside the purview of an electric utility as defined by the Legislature.

Additionally, the PSC does not have the statutory authority necessary to approve cost recovery for the Woodford Project through the characterization of the project as "a long-term physical hedge." While PSC's ratemaking authority includes examining and approving cost recovery for public utilities' hedging of fuel costs, see In re: Fuel and Purchased Power Cost Recovery Clause with Generating Performance Incentive Factor, Order No. PSC-08-0667-PAA-EI, 2008 WL 6347188 (Fla. P. S. C. Oct. 8, 2008), the Woodford Project does not involve a certain quantity of fuel for a certain price.

The fuel cost adjustment clause is a cash flow mechanism to allow utilities to recover costs for unanticipated changes in fuel costs between ratemaking proceedings. See Gulf Power Co., 487 So. 2d at 1037 ("Fuel adjustment charges are authorized to compensate for utilities' fluctuating fuel expenses. The fuel adjustment proceeding is a continuous proceeding and operates to a utility's benefit by eliminating regulatory lag."). The mechanism also permits utilities to recover actual costs of financial derivatives and physical hedges that help prevent price shocks from volatile fuel costs. However, regulated utilities through the fuel

clause do not earn a return on money spent to purchase fuel. Likewise, while the costs of hedging contracts are pass-through costs, utilities through the fuel clause do not earn a return on the cost of hedging positions purchased.

Specifically, hedging involves locking in a future price to avoid the adverse effects of price fluctuations, and utilities can hedge by entering into financial arrangements to secure natural gas at a future point in time at a fixed price. See Stephen Maloney, When the Price is Right, 145 No. 10 Pub. Util. Fort. 24, 25-26 (Oct. 2007). "While comprising mostly options and swaps, financial hedging instruments can include futures, basis swaps, and fixed-price swaps involving natural gas." Id. at 25. Moreover, "[i]n addition to financial instruments, weather derivatives and natural-gas storage provide important vehicles for mitigating price volatility through physical hedges against shortages and disruptions to pipeline operations." Id. at 26.

Permitting advance recovery of FPL's investment in the Woodford Project's exploration and production of natural gas will not pay for the costs of actual fuel. It will provide recovery, instead, for investment, operation, and maintenance and operation of assets that will provide access to an unknown quantity of fuel in the future. It is impossible to know what the costs of the natural gas will be until it is actually produced. There is more uncertainty from this investment rather than less. Therefore, it cannot be characterized as a physical hedge.

Additionally, under FPL's proposal for the Woodford Project, ratepayers (not FPL) bear the risk of natural gas price volatility and all of the production risks. If the production cost of extracting natural gas from the Woodford wells, including profit paid to FPL on its capital investment, is less than the natural gas market price, the ratepayers will benefit. However, if the production costs of extracting natural gas from the Woodford wells is more than the natural gas market, the ratepayers do not benefit but will instead suffer a loss. The monies spent on the Woodford Project are not a mere pass-through, like other fuel expenses, because FPL will earn a return on its capital expenditures. Accordingly, the Woodford Project is a guaranteed capital investment for FPL; it is not a hedge to stabilize fuel costs.

This may be a good idea, but whether advance cost recovery of speculative capital investments in gas exploration and production by an electric utility is in the public interest is a policy determination that must be made by the Legislature. For example, in contrast to natural gas exploration and production, the Legislature has authorized the PSC to approve cost recovery for capital investments in nuclear power plants and energy efficient and renewable energy power sources. See §§ 366.8255; 366.92; 366.93, Fla. Stat. (2014). Without statutory authorization from the Legislature, the recovery of FPL's costs and capital investment in the Woodford Project through the fuel clause is overreach.

### III. CONCLUSION

Accordingly, because the PSC exceeded its statutory authority when approving recovery of FPL's costs and investment in the Woodford Project, we reverse.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, and PERRY, JJ., concur. CANADY, J., dissents with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

CANADY, J., dissenting.

Because I conclude that the PSC acted within its statutory authority in approving cost recovery through the fuel clause for FPL's Woodford Project and that competent, substantial evidence supports the PSC's conclusion that the Woodford Project acts as a long-term physical hedge, I dissent.

I disagree with the majority's conclusion that under sections 366.06(1) and 366.02(2), Florida Statutes (2014), "cost recovery is permissible only for costs arising from the 'generation, transmission, or distribution' of electricity." Majority op. at 7. Section 366.02(2) defines an "[e]lectric utility" as "any municipal electric utility, investor-owned electric utility, or rural electric cooperative which owns, maintains, or operates an electric generation, transmission, or distribution system within the state[,]" and section 366.06(1) provides that the PSC "shall have the

- 11 -

authority to determine and fix fair, just, and reasonable rates that may be requested, demanded, charged, or collected by any public utility for its service." But even when read together, the plain language of these statutes contains no legislatively imposed limitation on the types of costs that an electric utility can recover through the PSC's ratemaking proceedings.

"The [only] statutory standard imposed upon the Commission is to fix 'fair, just and reasonable rates.' " Citizens of State v. Pub. Serv. Comm'n, 425 So. 2d 534, 540 (Fla. 1982) (citing §§ 366.06(2), 366.05(1), Fla. Stat. (1979)). Indeed, the Legislature mandated that the provisions of chapter 366 "be liberally construed" "for the protection of the public welfare[.]" § 366.01, Fla. Stat. (2014). And "[t]his Court has consistently recognized the broad legislative grant of authority which these statutes confer and the considerable license the Commission enjoys as a result of this delegation." Citizens, 425 So. 2d at 540. Neither section 366.02(2), section 366.06(1), nor any other provision in chapter 366 limit the PSC's authority to approve cost recovery to costs directly expended on generating, transmitting, or distributing electricity. To insert such a limitation has the effect of rewriting the statutes, which this Court may not do. See Hawkins v. Ford Motor Co., 748 So. 2d 993, 1000 (Fla. 1999) ("[T]his Court may not rewrite statutes contrary to their plain language.").

Under the broad discretion afforded to it in chapter 366, the PSC regularly allows utilities to recover costs through the fuel clause for non-fuel items as long as they are projected to result in fuel savings. See e.g., In re: Fuel & Purchased Power Cost Recovery Clause and Generating Performance Incentive Factor, Order No. PSC-01-2516-FOF-EI, 2001 WL 1677492 (Fla. P.S.C. Dec. 26, 2001) (approving cost recovery through the fuel clause for incremental power plant security costs); Re Fuel & Purchase Power Cost Recovery Clause, Order No. PSC-97-0359-FOF-EI, 1997 WL 199376 (Fla. P.S.C. March 31, 1997) (approving cost recovery through the fuel clause for FPL's investment in rail cars). The Woodford Project is projected to result in fuel savings of $51.9 million, and the magnitude of potential positive savings exceeds the magnitude of potential losses. Although it is not possible to know exactly what the actual cost of the gas produced by the Woodford Project will be until it is produced or what the market price of natural gas will be over the course of the next thirty years, the PSC has historically relied on projections to determine whether a capital investment will result in fuel savings to customers and should be recovered through the fuel clause. See, e.g., Re Fuel & Purchased Power Cost Recovery Clause, Order No. PSC-95-1089-FOF-EI, 1995 WL 553104 (Fla. P.S.C. Sept. 5, 1995) (relying on projected savings of $24 million over fifteen years).

Even assuming that chapter 366 implicitly limits the PSC's authority to approve cost recovery to costs of generation, transmission, or distribution of electricity, I would still conclude that the PSC acted within its authority in approving cost recovery for the Woodford Project. The purpose of the Woodford Project is to acquire natural gas, which is used to produce approximately 65% of the electricity FPL generates. Acquiring natural gas is therefore necessary for and integrally related to FPL's primary function of generating electricity.

Until now, FPL has purchased natural gas on the wholesale market. There is no dispute that acquiring fuel on the wholesale market is sufficiently related to the generation of electricity for the PSC to authorize cost recovery through the fuel clause. The Woodford Project would provide FPL the ability to acquire natural gas fuel directly from the ground at the production cost, rather than paying market price. There is no principled distinction between purchasing natural gas on the wholesale market and purchasing it in the ground and extracting it. Nor is there any requirement that fuel used in the generation of electricity be purchased on the market in order for an electric utility to be able to recover the cost of the fuel through the fuel clause. Thus, the Woodford Project is sufficiently related to "the

generation, distribution, and transmission of electricity" to come within the PSC's ratemaking authority.[3]

I also disagree with the majority's conclusion that the Woodford Project does not qualify as a long-term physical hedge because it does not involve "a certain quantity of fuel for a certain price." Majority op. at 8. The primary purpose of hedging programs is to reduce the variability or volatility in fuel costs paid by customers over time. E.g., In Re: Fuel & Purchased Power Cost Recovery Clause with Generating Performance Incentive Factor, Order No. PSC-06-1057-FOF-EI, 2006 WL 3837488 (Fla. P.S.C. Dec. 22, 2006). Purchasing a certain quantity of fuel for a certain price is not the only way to reduce the variability or volatility in fuel costs. See Stephen Maloney, When the Price is Right, 145 No. 10 Pub. Util. Fort. 24, 25 (Oct. 2007) ("A hedging strategy employs various physical and financial strategies with the goal of offsetting the risk of unfavorable price swings when purchasing energy."). The PSC's conclusion that the Woodford Project qualifies as a long-term physical hedge is supported by testimony at the evidentiary hearing that the costs of the Woodford Project are essentially fixed, highly predictable, well understood, more stable than prices in the natural gas

---

3. Although the majority repeatedly mentions that the Woodford Project involves exploration for natural gas, there was evidence presented at the evidentiary hearing that exploration is not a component of the Woodford Project.

market, and likely to decrease over the life of the project due to continuing technological advances.

In concluding that the Woodford Project acts as a long-term physical hedge, the PSC stated:

> The objective of any hedging program is to minimize price volatility. We have found that minimizing price volatility produces customer benefits. Financial hedging programs have different terms, from several weeks to up to two years. At the end of the year, the actual costs associated with the programs are passed on to customers. Because natural gas prices are uncertain and volatile, there will be periods when the companies have hedging gains and other periods where the companies will have hedging losses. We note that utilities are not expected to predict or speculate on whether markets will ultimately rise or fall and actually settle higher or lower than the price levels that existed at the time hedges were put into place. We have found that hedging maintains flexibility for a utility to create the type of risk management program for fuel procurement that it finds most appropriate while allowing us to retain the discretion to evaluate, and the parties the opportunity to address, the prudence of such programs at the appropriate time.
> 
> Any type of hedging is still going to be subject to market conditions. Historically, production costs have been less volatile than market prices. We find the Woodford Project will act as a hedge that is designed to decouple costs from market prices. [n.7] The Woodford Project costs are based solely on the operations and maintenance costs, and on the investment that is required, and is essentially fixed. FPL purchases more natural gas than any other electric utility in the country. The reality is that in this state, and nationally, we continue to grow the need for natural gas to provide electricity as we move away from coal. Although the Woodford Project is relatively small and will have a small effect on FPL's overall cost of natural gas and on price hedging, it will act as a long-term physical hedge (30 years or longer in duration) compared to financial hedges, which typically lock in prices for 12-24 months.

[N.7] We note that customers currently bear certain drilling, production, and shale gas risks (earthquakes, environmental issues, etc.) as these factors are embedded in the market price of gas.

In re: Fuel & Purchased Power Cost Recovery Clause with Generating Performance Incentive Factor, Order No. PSC-15-0038-FOF-EI, 2015 WL 183883 (Fla. P.S.C. Jan. 12, 2015) (some footnotes omitted).

The Woodford Project is a capital investment that is designed to decouple the cost of the gas obtained from the market price. The majority points out that if the production cost for the Woodford Project is less than the market price of natural gas, ratepayers will benefit, but if the production cost is higher than the market price, ratepayers will suffer a loss. But as the PSC recognized, such a risk is inherent with any type of hedging.

In characterizing the Woodford Project as "a speculative oil and gas venture[,]" majority op. at 2, and concluding that it will result in "more uncertainty . . . rather than less[,]" majority op. at 9, the majority is merely substituting its judgment for the PSC's judgment and expressing disagreement with the PSC's factual findings. But it is the PSC's "prerogative to evaluate the testimony of competing experts and accord whatever weight to the conflicting opinions it deems necessary." Gulf Power Co. v. Fla. Pub. Serv. Comm'n, 453 So. 2d 799, 805 (Fla. 1984) (citing United Tel. Co. v. Mayo, 345 So. 2d 648, 654 (Fla. 1977). We have stated that we "will not overturn an order of the PSC because we

would have arrived at a different result had we made the initial decision and we will not re-weigh the evidence. Our task is to determine whether competent substantial evidence supports a PSC order." S. All. for Clean Energy v. Graham, 113 So. 3d 742, 753 (Fla. 2013) (quoting Gulf Power Co., 453 So. 2d at 803). The testimony and exhibits presented at the evidentiary hearing provide competent, substantial evidence to support the PSC's conclusion that the Woodford Project acts as a long-term physical hedge.

Finally, I disagree with the majority's conclusion that costs for the Woodford Project cannot be recovered through the fuel clause because "regulated utilities through the fuel clause do not earn a return on money spent to purchase fuel" or "on the cost of hedging positions purchased." Majority op. at 8-9. The majority is correct that utilities do not earn a profit on fuel by marking up fuel purchased at market price, but the Woodford Project is not a purchase of fuel at market price, it is a capital investment. It is well established that "a regulated public utility is entitled to 'an opportunity to earn a fair or reasonable rate of return on its invested capital.' " Gulf Power Co. v. Wilson, 597 So. 2d 270, 273 (Fla. 1992) (quoting United Tel. Co. v. Mann, 403 So. 2d 962, 966 (Fla. 1981)); see also Gulf Power Co. v. Bevis, 289 So. 2d 401, 403 n.1 (Fla. 1974) ("A regulated public utility is, of course, entitled to an opportunity to earn a fair rate of return on its invested capital." (citing City of Miami v. Fla. Pub. Serv. Comm'n, 208 So. 2d 249

- 18 -

(Fla. 1968))).  And the PSC has historically allowed a utility to earn a return on investment for fuel-related capital projects included in the fuel clause.  See In re: Fuel & Purchased Power Cost Recovery Clause with Generating Performance Incentive Factor, Order No. PSC-12-0425-PAA-EU, 2012 WL 3775984, at *1 (Fla. P.S.C. Aug. 16, 2012) ("This Commission, when appropriate, allows recovery of a return on capital investments through the Fuel and Purchased Power Cost Recovery Clause[.]"); In re: Petition by Florida Power & Light Co. to Recover Scherer Unit 4 Turbine Upgrade Costs Through Envtl. Cost Recovery Clause or Fuel Cost Recovery Clause, Order No. PSC-11-0080-PAA-EI, 2011 WL 339538 (Fla. P.S.C. Jan. 31, 2011) (citing capital projects recoverable through the fuel clause that included a return on investment).  Thus, the fact that FPL will earn a reasonable rate of return on its capital investment in the Woodford Project does not preclude cost recovery through the fuel clause.

For these reasons, I would conclude that the PSC acted within its authority in approving cost recovery through the fuel clause for the Woodford Project, and I would affirm the orders on review.

An Appeal from the Florida Public Service Commission

James Ray Kelly, Public Counsel, Charles J. Rehwinkel, Deputy Public Counsel, John Joseph Truitt, Associate Public Counsel, and Erik Louis Sayler, Associate Public Counsel, Office of Public Counsel, Tallahassee, Florida,

for Appellant Citizens of the State of Florida

- 19 -

Robert Scheffel Wright and John Thomas LaVia, III of Gardner, Bist, Bowden, Bush, Dee, LaVia & Wright, P.A., Tallahassee, Florida,

for Appellant Florida Retail Federation

Jon Cameron Moyle, Jr. and Karen Ann Putnal of the Moyle Law Firm, P.A., Tallahassee, Florida,

for Appellant Florida Industrial Power Users Group

Charles J. Beck, General Counsel, Samantha M. Cibula, Associate General Counsel, and Adria Elise Harper, Associate General Counsel, Tallahassee, Florida,

for Appellee Florida Public Service Commission

Raoul G. Cantero, III, Thomas Neal McAliley, and Jesse Luke Green of White & Case LLP, Miami, Florida; and John T. Butler and Maria Jose Moncada, Florida Power & Light Company, Juno Beach, Florida,

for Appellee Florida Power & Light Company

Jack L. McRay, AARP Florida, Tallahassee, Florida, and Julie Nepveu, AARP Foundation Litigation, Washington, District of Columbia,

for Amicus Curiae AARP